STATE, EX REL. HUDSON J. WINNETT ET AL., RELATORS, V.
UNION STOCK YARDS COMPANY OF OMAHA, RESPOND-
ENT.

FILED MARCH 5, 1908.   No. 15,516.

1. Carriers: STOCK YARDS COMPANY A COMMON CARRIER.  A stock yards
company has about 35 miles of railway track, including what is
known as a "transfer track," constructed upon its own premises.
Several private industries are conducted adjacent to the premises
of the company.  The transfer track connects with the track of
several railway lines running to the city where the stock yards
are located.  The stock yards company is engaged in the carry-
ing of freight in car-load lots.  Cars billed to the stock yards, or
to the industries adjacent thereto, are placed on the transfer
track by the railway company over whose line the car is shipped,
and from there are hauled by the stock yards company with its
own engines to the pens or sheds in the yards or to the indus-
tries which are to receive the freight.  Outgoing cars are hauled
by the stock yards company to the transfer track, where they are
received by the railway company.  The railway companies for
whom such service is rendered are charged $1 a car therefor.  It
does not deal with the general public, but only with the railway
companies whose lines connect with the transfer line and with
the industries located upon the margin of its premises, and with
the consignees and consignors of live stock who receive ship-
ments or load shipments in its yards.  It transports freight in
cars over its own tracks from one industry upon its lines to an-
other.  It is not engaged in the production of commodities.  Its
vocation is purely one of service to others, and, with the excep-
tion of feeding live stock in transit, the service rendered is the
transportation of freight.  Held, That such stock yards company
is a common carrier within the meaning of the constitutional
amendment adopted at the general election in 1906 and chapter
90 of the laws of 1907.

2. ———: STATUTE: CONSTRUCTION.  Section 4, ch. 90, laws 1907, pro-
vides in part: "The term common carriers as used herein shall
be taken to include all corporations, companies, individuals and
association of individuals, their lessees, or receivers (appointed
by any court whatsoever) that may now or hereafter own,
operate, manage or control any railroad, interurban or street
railway line, * * * or any express company, car company,
sleeping car company, freight and freight line company, tele-
graph and telephone companies and any other carrier engaged in
the transmission of messages or transportation of passengers or

freight for hire." *Held*, That the phrase "any other carrier engaged in the transmission of messages or transportation of passengers or freight for hire" means only such companies as by their public profession hold themselves out to the world as engaged in the vocation of transmitting messages, or transporting passengers or freight for hire, and as willing to perform such services for any person who may have occasion to employ them.

3. ————: COMMON CARRIER: DEFINITION. Any person or corporation holding itself out to the public as offering its services to all persons similarly situated, and performing as its public vocation the services of transporting passengers, freight or intelligence, is a common carrier in the particular spheres of such employment.

ORIGINAL application for writ of mandamus to compel respondent to file with relators all freight schedules, classifications, rates, tariffs and charges used by respondent. *Writ allowed.*

*William T. Thompson, Attorney General,* for relators.

*Frank T. Ransom* and *Baxter & Van Dusen, contra.*

EPPERSON, C.

In their petition relators allege, among other things, that the respondent is a corporation and a common carrier; that it is the duty of respondent, pursuant to section 5, art. VIII, ch. 72, Comp. St. 1907, to file with relators within 30 days after the 27th day of March, 1907, all freight schedules, classifications, rates, tariffs and charges used by respondent and in effect January 1, 1907; and that respondent refuses so to do, though often requested by relators. Relators pray for a writ of mandamus requiring respondent forthwith to file such schedule with relators as the Nebraska State Railway Commission. Respondent answered, setting forth at length the nature of its business, admitted that it was a corporation, but denied that it was a common carrier.

The following facts are either admitted by the pleadings or established by the evidence: The respondent is a corporation duly organized and existing under and by virtue

of the laws of the state of Nebraska, and among other provisions of its articles of incorporation is the following: "The general nature of the business to be transacted by said corporation shall be the purchase and sale, the feeding and caring for, slaughtering, dressing, packing and holding for sale, selling and selling for others, of live stock, including cattle, hogs, sheep and horses, and shipping by refrigerator cars or otherwise of meats and product thereof, and doing generally the business of a stock yard, and whatever is incident or anywise related to or usually connected therewith. And in furtherance of the said business of the said company to guarantee the obligations of other corporations and of other parties and to apply its funds to the purchase and payment of stocks and bonds or either stocks or bonds of other corporations. It shall be competent for said corporation to construct, maintain and operate a railroad, with tracks of other railroad companies, which shall be operated for the purposes of its business as above set forth, as well also of carrying passengers and freight for the general public. The termini of said road shall be the city of Omaha in county of Douglas and a point on the south line of said county not farther west of the Missouri river than fifteen miles, and the amount of capital stock necessary to construct such road is ($300,000) three hundred thousand dollars." Respondent, however, has never been engaged in the packing business, or shipping any commodities of its own production, nor has it ever been engaged in passenger traffic. It owns a large tract of land in South Omaha upon which it has constructed buildings, sheds and pens for receiving and caring for live stock, and has upon its premises about 35 miles of railroad tracks. There are located on the margin of respondent's premises five slaughtering and packing houses owned by different corporations where live stock is slaughtered and the products packed for shipment. There are also located on its premises a lumber yard, a grain elevator, and a cooperage company's plant and other industries. Respondent has

railroad tracks upon its premises leading to said sheds and pens and to the said several industries located on its tracks, and these tracks connect with a transfer track, which connects with the tracks of several railroad companies engaged in interstate and state traffic. Cars loaded with live stock and other freight are transferred into respondent's premises, and to the pens, sheds and buildings thereon and to the several industries by means of said transfer track and the other tracks upon respondent's premises. Cars going into respondent's premises are placed by the railroad company desiring them carried in on the transfer track; this track being located on respondent's premises. And respondent there receives the cars, and takes them by means of its locomotives and engines to the point of destination in respondent's premises. Cars destined out of respondent's premises are carried by it over its tracks by means of its said locomotives to the transfer track, where the railroad company over whose lines they are to be carried receives them and hauls them away. Empty cars are delivered by the several railroad companies upon the transfer track, and these are hauled by the respondent in this manner either to the pens, sheds, buildings, or industries on respondent's premises, as directed by the company setting the cars on the transfer track. Respondent owns three flat cars used only upon its own premises for picking up refuse in and about the yards and for hauling cinders from the packing plants into respondent's premises. It owns eleven engines which it uses in its business. It has constructed no railroad tracks except those upon its own premises other than one track across the streets, authority for which was given by ordinance. Respondent has no station on its premises other than where live stock is unloaded and loaded into cars and at the industries mentioned above. At all these stations, and at the industries, the freight is received into cars owned by the railroad companies. Live stock received into or going out of the yards is unloaded and loaded by respondent, and freight received or shipped

from the industries is unloaded or loaded by the plants. Respondent has never exercised the power of eminent domain. Respondent, in the manner aforesaid, handles all cars requested by the common carriers to be handled by it where the tracks of the requesting common carrier reaches the transfer track, for which service respondent receives compensation from the railroad companies as provided in a circular of charges based upon a written contract between respondent and some of the railroad companies. The same charges are made other companies not signing the contract. Respondent has no tracks for unloading and loading freight from wagons into cars or from cars into wagons, or any place for the general public to receive or load freight for shipment. Where the owner of live stock in the yards desires to ship same out of the yards, respondent procures the necessary cars from the railroad company over whose lines the stock is to be shipped, loads them, and delivers the same to the railroad company upon the transfer track. The manner of receiving live stock destined to points in the yards is for the railroad company to deliver to respondent a waybill and to set cars upon the transfer track. This waybill shows the point of origin of the shipment and point of destination. Respondent takes the cars into its premises and unloads them to the consignee. Respondent collects all of the freight charges due to railroad companies on incoming live stock when not prepaid, and pays the same over weekly to the railroad companies, but collects no freight charges on outgoing freight nor on incoming dead freight. When requested, respondent transfers cars from one railroad company to another. The railroad companies are not authorized to issue any bill of lading for respondent for any shipment incoming or outgoing from its premises, nor does respondent issue any bills of lading on its own behalf, or on behalf of any railroad company connected with its tracks, nor does it fix rates for the connecting companies. Live stock consigned to points inside of the yards is generally consigned to a commission

agent to whom it is delivered by respondent. The live stock agent sells the shipment for the owner, and if the freight charges have not been prepaid the commission man pays the charges to respondent, who pays it over weekly to the railroad companies. Respondent does not receive any freight from the railroad companies except cars loaded with freight. The average daily receipts during the year are about 625 cars received in, which would make a movement of 1,250 cars in and out daily. There are 152 chutes on respondent's premises where live stock is loaded and unloaded. Respondent has never filed any plat of the route of the track that has been built on its premises nor of any intended to be built, and has never made a report to the secretary of state in conformity with section 1, art. XI of the constitution, nor as required by section 88, ch. 16, Comp. St. 1907. Respondent's property is assessed by the local assessor for taxation, and is not assessed by the state board of equalization. It might further be said that respondent also hauls cars from one industry to another in their interchange of business, and receives compensation therefor from the industry receiving the service. A fee is paid by the railroad companies for respondent's services in taking loaded cars to and from the industries and from the transfer tracks and stock yards, the amount being the same ($1 a car), and does not depend upon the distance hauled nor the amount of freight contained in the cars. From time to time the respondent changed its articles of incorporation, and on one occasion by a resolution, duly made and passed, the proper officers were directed to certify the adoption of an amendment according to the requirements of the general railroad laws of this state, thereby indicating its intention at that time to operate under our railroad laws. Respondent has never, however, taken advantage of its charter right to operate a railroad devoted to a general freight and passenger traffic, and its tracks have not been extended beyond the limits of its own property.

Summarizing this statement of facts we find the following, which we consider control this case: Respondent is authorized by its charter to construct and operate a railroad for the purpose of carrying freight for the general public. It has constructed railroad tracks connecting with the tracks of other carriers, and connecting also with a large number of industries whose plants are established upon the margin of respondent's property. It is engaged in the carrying of freight which the public consigns in car-load lots, or which the connecting carrier assembles in car-load lots, to the several industries upon its tracks, and to the commission men who receive consignments of live stock in the yards of the respondent. It carries like shipments for the shippers of live stock from its yards, and also from the industries located upon the margin of its land, and delivers the same to the several connecting carriers. It transports freight from one of the aforesaid industries to another. It is not engaged in the production of commodities. Its vocation is purely one of service to others. With the exception of feeding live stock in transit, the service rendered is the carrying of freight. For the service thus rendered it receives a compensation.

At the general election in 1906 there was adopted an amendment to our constitution which is as follows: "There shall be a State Railway Commission, consisting of three members, who shall be first elected at the general election in 1906, whose terms of office, except those chosen at the first election under this provision, shall be six years, and whose compensation shall be fixed by the legislature. Of the three commissioners first elected, the one receiving the highest number of votes, shall hold his office for six years, the next highest four years, and the lowest two years. The powers and duties of such commission shall include the regulation of rates, service and general control of common carriers as the legislature may provide by law. But in the absence of specific legislation, the com-

mission shall exercise the powers and perform the duties enumerated in this provision."

By an act of the legislature, appearing as chapter 90, laws 1907, the legislature prescribed the powers, duties and qualifications of the state railway commission. Section 4 is in part as follows: "The term common carriers as used herein shall be taken to include all corporations, companies, individuals and association of individuals, their lessees, or receivers (appointed by any court whatsoever) that may now or hereafter own, operate, manage or control any railroad, interurban or street railway line, operated either by steam or electricity or any other motive power, or part thereof, or any express company, car company, sleeping car company; freight and freight line company, telegraph and telephone companies and any other carrier engaged in the transmission of messages or transportation of passengers or freight for hire."

The question presented for determination, stated generally, is this: Is the respondent a common carrier within the meaning of the constitutional amendment and the act of the legislature of 1907? Respondent contends that it is not a common carrier within the common law definition of that term, that the common carriers of the constitutional amendment are such carriers only as would be declared common carriers by the common law, and that the definition prescribed by the legislature is an unwarranted expansion of the meaning of the term. At the threshold of this case, therefore, we are met with the inquiry: Is the definition of "common carrier" in the act of the legislature an enlargement of the meaning of those words which will prohibit the application of the act to a class of agencies not strictly within the common law classification of common carriers?

There are but two carriers known in law—private carriers and common carriers. A private carrier undertakes to deliver particular goods at a particular place. He is not bound in law to undertake such transportation. When opportunity for such employment is presented, he may

reject it or avail himself of it as he sees fit. He enters into a contract applicable to and binding him only as to the particular undertaking. He does not hold himself out to the public as a carrier. Strictly speaking, at common law, so far as its vocation is concerned, a common carrier is one which holds itself out to the public as a carrier always open to employment for the transportation of persons or freight, and that it will carry for all persons indiscriminately. A common carrier undertakes to convey freight from one place to another, and it makes no difference whether the distance be long or short. It is not necessary to make of itself a common carrier that it should hold itself out as ready to transport freight from any place to any other place; but the transportation may be confined from one point upon the line it operates to another point upon its line, or upon the line of a connecting carrier. By the present general adoption and use of the term "common carrier" it is not necessarily limited to one which holds itself out to carry any and all kinds of freight, but it applies with equal force to any company whose vocation is of a public nature, although limited to the transportation of certain classes or kinds of freight, and it may be of service to a limited few who by their peculiar situation or business may have occasion to employ it. With the development of commerce and increased facilities for the transportation of passengers, freight, and intelligence the meaning of the words "common carrier" has correspondingly changed, not alone by technical and arbitrary legislative enactment, but by reasonable, necessary, and general adoption, so that now it means not only the stage coach and canal boat, but railway, street railway, and express companies—yes, telegraph and telephone companies. It appears that, in addition to operating the tracks within the boundaries of its own private property, the respondent receives from connecting railway companies, and delivers to the various packing plants and industries adjacent to its property, freight cars for the transportation of live stock and

merchandise. It accepts from connecting carriers loaded or empty cars, and delivers the same to the several industries, or to the consignee of live stock, or to the shipper of live stock from its yards, irrespective of persons, and for these purposes it must be considered as forming a component part of the system of railway transportation carried on by the connecting lines, and to this extent it is equally subject to the duties and obligations of a common carrier. We think there can be no doubt but that the respondent can be required to extend equal privileges to any person who may establish an industry for the production of commodities for shipment upon the margin of its grounds, that it could be compelled, if necessary, to furnish to any person who might desire to ship live stock under like conditions the same facilities that it now furnishes to its present patrons. We think there can be no doubt but that a railroad company, building its tracks to the transfer line of the respondent, could demand and receive the same facilities for the delivery of live stock to commission men at South Omaha and to the several industries adjacent to respondent's property as is now given to the present connecting railroads. As to such person the respondent must be considered a common carrier, even though it transacts only a small part of the business transacted by such common carriers as are doing a general business; or, in other words, it is a common carrier in the special line to which it has devoted its energies, although not a common carrier for all purposes.

Respondent does not produce commodities. Its business is strictly one of service to others. Its scope is one of magnitude, handling, as the evidence shows, 1,250 cars a day, or 456,250 during the year. Its vocation is the transportation of freight over its own lines. It holds itself out to the public as ready and willing to transport all freight for those who have occasion to employ it for the purpose for which it exists, and receives compensation therefor. The statute, we think, has reference to all

companies or persons who hold themselves out to the public as engaged in those things which characterize it as a common carrier. It has been said that a common carrier is one who holds itself "out as ready 'to carry at reasonable rates such commodities as are in his line of business for all persons who offer them, as early as his means will allow.' " *Faucher v. Wilson,* 68 N. H. 338, 39 L. R. A. 431, and cases cited. In the case at bar, respondent holds itself out as a carrier of certain classes of freight, namely: such as is tendered it in car-load lots. That is its line of business. It is a common carrier within the meaning of section 4, ch. 90, laws 1907, and the constitutional amendment.

In *Missouri P. R. Co. v. Wichita Wholesale Grocery Co.,* 55 Kan. 525, 40 Pac. 899, it was held: "A railroad company taking loaded cars from its connection with another railroad, and transferring them by means of a switch engine over a portion of its own track to a spur of its own, and receiving its compensation from the connecting road, acts as a common carrier, and is liable as such for the safety of the goods transported, no matter how short the distance from the place of receipt to that of delivery." In the opinion we find the following: "All railway corporations are by statute made common carriers, and required to transport persons and property, as such, for all persons alike. Gen. St. 1889, par. 1212. The distance over which freight is hauled, whether in car-load lots or in less quantities, whether in its own cars or those belonging to connecting carriers, can make no difference with the capacity in which the company acts. A railroad transporting a passenger or a car-load of freight one mile, using a switch engine for motive power, is just as much a common carrier as if the distance were a thousand miles by regular freight or passenger train." See, also, *United States v. Union Stock Yards Co.,* 161 Fed. 919.

The bulk of respondent's business comes from the railroads running into South Omaha. These railroad companies are not producers of the goods, wares, merchandise

and live stock delivered to respondent for transportation or delivery. Such freight consists of commodities consigned by the public to the industries upon the respondent's tracks, or to commission men receiving live stock at the respondent's yards. Though the respondent receives such employment from the railroad companies and looks to them for its compensation, yet its service is to the public, to the same extent as were the services rendered by the connecting railroads in their transportation of the same freight. It holds itself out as ready and willing to transport such freight to the several industries and to the stock yards for all railroads entering South Omaha. Its employment is not limited to a certain few, but extends to all railroads. It is continually at work, daily transacting business of importance to the commercial world. It is the center of a vast transportation or commercial business, to complete which its duties as a carrier are constantly invoked. Respondent admits that it is subject to legislative control, and that its rates may be regulated by statute. We think that this is true, and that it is true because respondent is a common carrier. If it is not such, then it is a private carrier, and the legislature would have nothing whatever to say about its rates. The statute above quoted clearly defines a common carrier, and, under its provisions, any one engaged in the transportation of freight for hire is declared to be a common carrier. This, however, must be construed to mean any person whose public profession is the transportation of goods, and who is not at liberty to reject the carrying of such freight as he has held himself out to the world as willing to convey. With this construction of the statute we find that it is not an unwarranted enlargement of the common law meaning of "common carriers," as that meaning has grown to designate the improved agencies of commerce, according to its general adoption and use, nor has the legislative provision exceeded the authority of the constitution in declaring what shall be considered common carriers.

Respondent contends that it is but a switching company; that because its charges for services rendered are made as a switching fee, and not based upon the weight or value of the freight, or upon the distance hauled, it cannot be classed as a common carrier. *Kentucky & I. Bridge Co. v. Louisville & N. R. Co.,* 37 Fed. 567, 616, 2 L. R. A. 289, is cited by respondent. It was there held: "Where a corporation, which is under no legal obligation to do so, voluntarily contracts to switch cars over its tracks, between two or more railways, for which service it collects a certain switching charge for switching the cars, loaded or empty, but charges no traffic rates on the freight transported or transferred in the cars, such corporati    in the performance of such service, assumes none of the responsibilities of a common carrier, but only those of a switchman. In respect to cars or traffic thus handled, such corporation can only be regarded as a switchman, or transfer company; and it is no more a common carrier of interstate commerce or traffic, within the provisions of the law, than a city transfer company, which checks a passenger's baggage at the hotel where it is received, and carries it, for an agreed compensation, to the station of the railway over which it is to be transported into another state." That case is clearly distinguishable from the one at bar. It there appears that the charter of the bridge company made the bridge "a public thoroughfare or highway, for the use of which by railroads or street cars, wagons, vehicles, animals and foot-passengers it was authorized to charge reasonable toll." It was said in the opinion: "The franchises and powers conferred upon petitioner of building, maintaining and operating its bridge and approaches, designated as its 'terminal facilities,' do not, in and of themselves, constitute it a common carrier of property; on the contrary, they are appropriately confined to the erection and maintenance of a thoroughfare or public highway, open to the use of others, common carriers and private parties, upon making compensation therefor in the shape of 'rea-

sonable tolls.' * * * The word, as used in its charter, is strictly applicable to charges for the use of its highway, rather than to compensation for transportation services to be performed by itself. The distinction between such an incorporated bridge or highway, established and maintained for use by common carriers and others, upon paying compensation for such use in the way of 'tolls,' however graduated, and that of an incorporated common carrier engaged in transporting property for hire, is well defined. * * * The powers and franchises conferred upon petitioner find their legitimate scope and operation in the building, operating, and maintaining of its bridge and approaches thereto, for the public purposes it was intended to subserve—that of furnishing and forming a highway over which common carriers and others should have the right or privilege of transporting goods or passing, as they pass over a turnpike, a canal, or a ferry, upon paying reasonable tolls for the use of the structure or thoroughfare; and do not in any way constitute petitioner a common carrier of goods, authorized to equip its road, or to charge compensation for transporting goods on or over the same. Nor does petitioner, in the legal sense of the term, act or hold itself out to the public as a common carrier of property, in connection with the railroads on either side of the Ohio river. It has no freight cars. When it solicits or accepts freight upon its tracks on either side of the river for any railroad company, it is compelled to call upon the railroad for whom the freight is intended, or over whose line it is to go, to furnish the cars in which to load the same. Such cars the petitioner merely transfers over its bridge, and delivers to the railroad furnishing the same, charging for its service its regular bridge-toll, which is in no sense a charge for transporting the freight contained or carried in the car or cars. In some cases it makes an additional charge for switching cars which require to be transferred from one connection to another. Its object and purpose in thus constituting itself the soliciting agent for the railroad companies who are willing

to provide the cars for the freight it may secure is manifestly to obtain 'tolls' for use of its bridge."

In the case at bar, the business of respondent differs materially from the business of the bridge company in the case last cited in that, instead of maintaining a highway for the use of other carriers, respondent uses its tracks and engines for the transportation of freight and cars of its patrons. As to the transferring of cars, loaded or empty, to and from the packing houses and transfer tracks of respondent and the railway companies, and to and from its yards, respondent is something more than a switching company. It is true the transfer of the cars from one track to another is necessary; but such transferring of cars to and from respondent's tracks and those of the connecting lines does not differ from transfers made between connecting lines of other companies which are recognized by all as common carriers. Such business of respondent in the handling of loaded cars intended for one of the ind stries established upon its tracks requires it to convey the car from the termini of the connecting railways to the industry or place of destination. This does not differ from the last haul made of freight shipped over the lines of several connecting railways, except that with respondent the distance is shorter than is usual in cases of other carriers. The fact that charges are fixed at so much for each car transferred, and are not based upon weight, bulk, or distance hauled, we think is unimportant. The statute declares any company engaged in the transportation of freight for hire is a common carrier. The charge made by respondent is its hire, and it transports freight, notwithstanding the fact that it may not know the contents of the cars hauled, nevertheless it is the existence of a necessity for the transportation of freight which gives respondent occasion to exist.

In *Kentucky & I. Bridge Co. v. Louisville & N. R. Co.,* *supra,* it is true that the physical act of switching cars

9

from one connecting line to another by the bridge company is similar to some of the work done by respondent herein, but such was only an incident to the principal business of the bridge company, which was not that of a common carrier.

It is contended by respondent that the railway commission has jurisdiction only over such railroads as are recognized as such by section 4, art. XI of the constitution. That section reads as follows: "Railways heretofore constructed, or that may hereafter be constructed in this state are hereby declared public highways, and shall be free to all persons for the transportation of their persons and property thereon, under such regulations as may be prescribed by law. And the legislature may from time to time pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight on the different railroads in this state. The liability of railroad corporations as common carriers shall never be limited." The constitution does not declare what a railroad is. It declares that railways are public highways for the use of all persons for the transportation of their persons or property. Respondent's railways cannot be said to be a highway for the transportation of persons; but this fact does not prevent the respondent's business from coming within the jurisdiction of the railway commission under the authority conferred upon it by the recent amendment to the constitution (Comp. St. 1907, sec. 421a) and chapter 90, laws 1907. In other words, a company doing a transportation business may be a common carrier, although its traffic is over tracks which may not constitute a public highway within the meaning of the constitution. Again, there is nothing in the constitution, as it originally stood, or in the 1906 amendment, nor in the act of the legislature, which limits the term "common carrier" to railroads. It is equally applicable to a stage coach, a ferry boat, a street railway, a telegraph or telephone company. If a person or a corporation holds itself out to the public as offering its

services to all persons similarly situated, and performs a service in the transportation of persons, freight or intelligence, it is a common carrier in the particular spheres of such employment. Thus considered, the respondent is brought within the constitutional and common law definition of "common carrier." This obviously includes all common carriers, whether railroad companies engaged in the transportation of both passengers and freight, or one only.

Respondent's transportation business is subject to the orders of the railway commission, and we recommend that the peremptory writ of mandamus of this court be issued, commanding respondent to forthwith file with the state railway commission all its freight schedules, classifications, rates, tariffs, and charges used by it and in effect June 1, 1907, pertaining to the transportation of freight.

By the Court: For the reasons stated in the foregoing opinion, it is ordered that a peremptory writ of mandamus be issued, commanding respondent forthwith to file with the . state railway commission all its freight schedules, classifications, rates, tariffs, and charges used by it and in effect June 1, 1907, pertaining to the transportation of freight.

WRIT ALLOWED.