STATE OF NEBRASKA, APPELLANT, v. SOUTHERN ELKHORN TELEPHONE COMPANY, APPELLEE.

FILED JUNE 23, 1921. No. 21387.

1. **Telegraphs and Telephones: "COMMON CARRIER:" SUPERVISION.** Where several farmers in cooperation constructed a rural telephone line, so as to connect their farms with a public service telephone company in town, from whom they purchased telephone boxes and rented transmitters, and were afforded switching service to local and long-distance subscribers over the lines of such telephone company, and paid to the telephone company the same rates as regular subscribers, but did not exact nor receive compensation for messages transmitted over their rural line, and raised no revenue except such sums by mutual assessment as were needed to maintain and keep in repair their properties, *held* that they were not operating as a common carrier, defined by our statute (Rev. St. 1913, sec. 6124) as "telephone companies * * * engaged in the transmission of messages * * * for

hire," and were not under the supervision of the Nebraska state railway commission.

2. ———: ———. Though section 7418, Rev. St. 1913, grants a right of way over the public roads of the state to "any telegraph or telephone company incorporated or doing business in this state," it does not follow that any one who erects poles and strings telephone wires upon a public road is a telephone company or a common carrier.

3. ———: ———. Though such a rural telephone line may render impracticable the extension of further telephone service in that particular locality, and hence be a matter of public concern, the fact that the situation is of public interest does not alone characterize the rural line as a public service company, nor identify it as a common carrier. Its character is to be determined rather by the purpose for which the property is intended to be used and the actual use to which it is devoted.

APPEAL from the district court for Madison county: WILLIAM V. ALLEN, JUDGE. *Affirmed.*

*Clarence A. Davis, Attorney General,* and *Hugh LaMaster,* for appellant.

*M. D. Tyler, contra.*

Heard before MORRISSEY, C.J., ALDRICH, FLANSBURG, LETTON and ROSE, JJ.

FLANSBURG, J.

This was an action by the state of Nebraska, brought against a number of farmers, who had constructed a rural telephone line and who called themselves the Southern Elkhorn Telephone Company, and was to compel them to obey an order of the Nebraska state railway commission, commanding them to furnish to one Doxstader, a farmer living in the vicinity, a connection with their telephone line. The trial court found in favor of the defendant and entered a dismissal, from which order the state appeals.

The sole question for determination is whether or not the so-called Southern Elkhorn Telephone Company is a common carrier and therefore under the jurisdiction of the Nebraska state railway commission. If found to be

such a common carrier, then the order of the railway commission, requiring it to extend its service to the farmer, Doxstader, must be enforced; otherwise, 'the order of the commission is without legal authority.

In 1917 the farmers mentioned, living in the vicinity of Norfolk, had requested telephone service from the Nebraska Telephone Company, which company was a public service corporation doing a telephone business at Norfolk and throughout the state. This the telephone company, in the first instance, refused to give, but the negotiations resulted in an agreement, in pursuance of which the farmers constructed at their own expense a telephone line from Norfolk to their farms, and purchased telephone boxes and rented transmitters from the telephone company, and were thereupon received by the telephone company as subscribers upon the same terms as the subscribers in Norfolk. Each one of the farmers contributed toward the expenses of constructing this party line. The telephone poles were placed, some in the highway, some along the property lines and used as fence posts, and some across private property. The farmers never incorporated or associated themselves as a company. They, however, adopted the name of Southern Elkhorn Telephone Company, for the purpose of convenience in their dealings as a collective body with the Nebraska Telephone Company. They kept their lines in repair and the expenses for such repairs were borne by mutual assessments made from time to time as needed. The repairs amounted to from $2 to $2.50 yearly for each farmer. The Nebraska Telephone Company at Norfolk furnished switching service for them and arranged to connect them with the Norfolk subscribers or with long-distance lines, and for this service the farmers paid the same rates as the Norfolk subscribers. One of their number each month collected from the others the regular rates and whatever long-distance tolls had been incurred by any of them, and remitted the entire amount in one sum to the Nebraska Telephone Company at Norfolk. The subscribers at Norfolk, or any one

at distant points, who wished to talk with these several farmers, could call through the exchange at Norfolk and be connected with the farmers' line. There are only 10 farmers connected with the rural line in question, but it is their contention that their line is already burdened and is insufficient to afford service for additional telephone users. The agreement, under which the farmers are act· ing, does not provide for taking in new members, nor for· extending service beyond the lines already constructed.

It is the contention of the attorneys for the state that the rural telephone line in question, having become connected with the Norfolk telephone system, has necessarily become an integral part thereof and therefore has become a common carrier. It is argued that the farmers on the rural line send messages to whomsoever they please, and hold themselves out as ready to accept and deliver all messages that may come to the rural line from subscribers at Norfolk and, in fact, from any part of the country over long-distance.

The legislature defined common carriers, so far as that term is applicable here, to be "telegraph and telephone companies    *    *    *    engaged in the transmission of messages    *    *    *    for hire." Rev. St. 1913, sec. 6124.

In order that a company be a common carrier, it is essential, in view of this statutory definition, as well as by the generally recognized meaning of the term "common carrier," that the service rendered by it must be a service that is rendered for hire. It was said by Justice Story in *Citizens Bank v. Nantucket Steamboat Co.*, 5 Fed. Cas. (No. 2730) 719, 725: "I take it to be exceedingly clear· that no person is a common carrier in the sense of the law, who is not a carrier for hire; that is, who does not receive, or is not entitled to receive, any recompense for his services. The known definition of a common carrier, in all our books, fully establishes this result." If no compensation is received, "he is not in the sense of the law a common carrier; but he is a mere mandatory, or gratuitous bailee; and of course his rights, duties and liabilities are

of a very different nature and character from those of a common carrier."

As pointed out in 10 C. J. 41, sec. 10: "The law applicable to common carriers is peculiarly rigorous, and it ought not to be extended to persons who have neither expressly assumed that character nor by their conduct and from the nature of their business justified the belief on the part of the public that they intended to assume it."

It is quite apparent that the farmers, when they constructed the rural line in question, had no idea of rendering service to the public. Their sole purpose was to procure telephone service for themselves. It was to that purpose, and that purpose only, that they dedicated their property. To now subject that property to another purpose than that for which it was given, or intended to be used, would be to take from them the right and the use of the property which has not been voluntarily yielded up. Where a person enters into the business of public service and operates as a common carrier, he voluntarily dedicates his property to the public use and acquiesces in a necessary public control of the business conducted; but where there is no such dedication to the public use, the state has no arbitrary right to take from an individual the control of property devoted to private interests. The farmers who constructed the line in question did not provide that they would extend service to whomsoever might apply, nor that they would engage in the business of transmitting telephone messages. They have not become bound to each other, nor to the public in general, to see that their rural line is always in first-class order and that messages received will be promptly and efficiently transmitted. To hold them as a common carrier would fix a liability upon them for negligence in failing to keep their lines in efficient order. The lines that they have constructed are for their own private use, and certainly are subject to such control and provision for repair and maintenance as they themselves shall elect to adopt.

It is argued that the rural line is similar to branch lines

of a railroad which are constructed to meet the demands of some private industry and become a part of the railroad system and subject to control as a part of a common carrier. The case of *Union Lime Co. v. Chicago & N. W. R. Co.*, 233 U. S. 211, is one of the cases cited as bearing out that contention. In that case it is to be noted that railway companies which were common carriers were given a statutory right to acquire necessary right of way and to extend spur tracks in order to meet the needs of manufacturing establishments, and that such a spur track, operated by a railroad company, was held to be a part of the railway system, and not a private side track belonging to the private establishment. In that case the court said (p. 222) : "There is a clear distinction between spurs which are owned and operated by a common carrier as a part of its system and under its public obligation and merely private sidings."

The case of *State v. Union Stock Yards Co.*, 81 Neb. 67, is relied upon as furnishing an analogy to the present case. There the court held that the stock-yards company, which operated tracks for the purpose of distributing cars of live stock, shipped in over various railroads, was a common carrier, though it distributed such shipments only to the several packing houses and industrial establishments directly connected with its lines. But in that case the Union Stock Yards Company was engaged in the business of carrying freight, and held itself out to the public generally to receive all live stock shipped over the railroads and to carry it from the railroad terminus to its destination, and this service was rendered for hire. In that case it is said (p. 82) : "If a person or a corporation holds itself out to the public as offering its services to all persons similarly situated, and performs a service in the transportation of persons, freight or intelligence, it is a common carrier in the particular spheres of such employment." Obviously, the rule stated there has no application to the case under consideration.

It is argued, since the rural line is partially constructed

upon public highways and since our statute (Rev. St. 1913, sec. 7418) grants a right of way upon the public roads of the state to "any telegraph or telephone company incorporated or doing business in this state," that the defendant cannot deny that it is a common carrier, nor that it is subject to public control as such. That contention, however, is to mistake the effect for the cause. Though the statute gives to all telephone companies engaged in public service a right of way over the public roads, it does not follow that any one who erects poles and strings telephone wires upon a public road is a telephone company or common carrier. If the farmers' rural line is not the line of a "telephone company," it may be that it has no right upon the highway and is there only by public sufferance, but the fact that it is on the highway certainly does not characterize the nature of the service which it renders.

Again, it is contended that the property of the defendant is impressed with a public interest, for the reason that it monopolizes telephone territory. It is argued that the line extending through this territory and rendering the service that it does creates a situation which would render it unprofitable and impracticable for any other telephone company to extend a line into the same territory, by reason of the fact that so few are left to become subscribers. The situation may be a matter of public interest and may render impracticable the extension of telephone service in that territory, but, unless the rural line constructed by the defendant is a common carrier, it does not come within the jurisdiction of the railway commission, no matter how great the public interest in the matter may be. The state, through its legislative authority, even though the enterprise is not a common carrier, may, when it pleases, deem it wise to prevent such organizations from constructing their lines upon or across the public highways, and thus save that territory to public service companies which will serve the entire community,

but this is not a matter for the railway commission, nor, at this time, for the court to pass upon.

In Illinois, where the law places public utilities and the property thereof, "devoted to a public use," under the supervision of the public utilities commission, it is held that a mutual telephone association, which has no charter authority to engage in public telephone service, to take on new members, or to devote its property to a public use, and is organized for the private use of its members only, and not for profit, is not within the jurisdiction of the commission as a common carrier. *State Public Utilities Commission v. Bethany Mutual Telephone Ass'n,* 270 Ill. 183; *State Public Utilities Commission v. Okaw Valley Mutual Telephone Ass'n,* 282 Ill. 336. The court in the case first above cited said (p. 185): "To constitute a public use all persons must have an equal right to the use, and it must be in common, upon the same terms, however few the number who avail themselves of it. It is not essential to a public use that its benefits should be received by the whole public or even a large part of it, but they must not be confined to specified, privileged persons."

In Missouri, where a statute, somewhat similar to our own, places under the public service commission utilities engaged "in the conduct of the business of affording telephonic communications for hire," it was held, in *State v. Public Service Commission,* 272 Mo. 627, L. R. A. 1918C, 820, that a mutual telephone company, the members of which own their own instruments and maintain their lines to a central station and contribute a quarterly amount to maintain such station, does not furnish telephonic communication for hire, although a fee is exacted in case a nonsubscriber talks on a telephone on the company's switchboard to one on a connecting line. The court in that case said (p. 640): "The constitution and by-laws and the oral testimony all point to the conclusion that the Auxvasse Company is primarily a private organization not operated for hire. Operation for hire is a pre-

requisite to supervision by the commission. The reason is plain. The commission was created, as is evident from the entire statute defining its powers, not to interfere with individual action except where same assumes a public nature, but to provide regulations and give plenary power as defined by the statute to the commission to control such utilities as from their nature and operations may affect the interests of the general public. All such organizations are commercial in their nature in that they are not conducted for favors, but for fees. Recognizing this fact, the framers of the public service act made this a condition precedent to commission control. That a fee may be exacted from nonsubscribers for talking from a telephone on the company's switchboard to one on a connecting line does not militate against the correctness of the conclusion that this company does not afford telephonic communications for hire. * * * The fee thus authorized to be charged is but an incident in the general conduct of the business of the company, and is not indicative of its character, which is to serve those who sustain it and not the general public."

In the case under consideration, the association of these ten farmers and their joint ownership in a rural telephone line, extending from Norfolk to their properties, cannot be dignified by the appellation of a public service company. Their property has never been dedicated nor devoted to a public use. It was provided merely as a private convenience. These farmers do not pretend to, nor do they, render a service to the public. Though outsiders may call them over their lines, they do not guarantee a faithful and careful transmission of the message, nor are they obligated to the public to any degree of care in keeping their lines in efficient readiness for use. They permit and invite such messages to come to them for their own convenience. They render no service, they make no profit, they exact no compensation, and cannot be held to be "a telephone company engaged in the transmission of messages for hire," within the meaning of our statute.

Since they were not operating as a common carrier, the railway commission has no jurisdiction, and the order made was without authority of law.

The judgment of the trial court is therefore

AFFIRMED.