DECK HOUSE, INC., a Massachusetts
Corporation, and Martin M.
Laibow, Plaintiffs,

v.

The NEW JERSEY STATE BOARD OF
ARCHITECTS, consisting of John
Swass, Elizabeth Moynahan, Bernard A.
Kellenyi, Alfred L. Wensley, Sidney
Schenker, Richard A. Berns, Patricia
Koch; and James Zazzali, Attorney General; and Adam K. Levin, Director of
Division of Consumer Affairs, Defendants.

Civ. A. No. 81–3861.

United States District Court,
D. New Jersey.

Feb. 3, 1982.

Eugene M. Haring, McCarter & English, Newark, N.J., for plaintiffs.

Peter A. Greene, Deputy Atty. Gen., State of N.J., Newark, N.J., for defendants.

OPINION

DEBEVOISE, District Judge.

The matter is before the Court upon plaintiffs' application for a preliminary in-

junction and defendants' motion to dismiss the complaint for failure to state a cause of action.

Plaintiff Deck House, Inc., a Massachusetts corporation having its principal place of business in that state, is a manufacturer of prefabricated housing. Plaintiff Martin A. Laibow, a Pennsylvania citizen, is an architect registered and licensed to practice in New Jersey. He has certified plans of prefabricated houses which Deck House has sold to New Jersey residents for construction in New Jersey.

The defendants are the New Jersey Board of Architects, James Zazzali, Attorney General of New Jersey, and Adam K. Levin, Director of the Division of Consumer Affairs of New Jersey.

Defendants have taken the position that plaintiffs, by selling prefabricated buildings utilizing such plans and by certifying such plans which were not originally prepared by New Jersey architects, have violated N.J.S.A. 45:3–10. That statute forbids the practice of architecture in New Jersey without a certificate issued by the Board of Architects. In essence, plaintiffs' action seeks to prevent application of N.J.S.A. 45:3–10 to them.

### The Facts

There is little, if any, dispute about the facts.

A. *The Prefabricated House Industry*: Deck House is one of more than 1500 producers of prefabricated, or manufactured, housing and housing components in the United States. A prefabricated house is one in which the materials are specified, manufactured, and often assembled under one roof. Included in this category are pre-cut, panelized, log and shell houses, geodesic domes, metal buildings, and modular/sectional houses. Additionally, many "conventionally built" houses are constructed with factory-made roof trusses and/or floor trusses, wall panels, floor panels, pre-hung windows, pre-hung exterior and interior doors, factory-made cabinetry and pre-jobbed plumbing systems, heating systems, kitchens or baths. The average selling price of a dwelling manufactured by Deck House is $57,000, to which must be added the cost of land, the charges of the building contractor, and the costs of all the elements of the house which are not included in the unit Deck House sells.

Most manufactured houses are sold in the form of a package including plans, which can be tailored to a customer's personal needs, and materials, which are pre-cut and/or assembled in accordance with the plans. The actual structure is then erected on the site by the owner himself or, more commonly, by a local builder.

According to statistics published in the 1981 Red Book of Housing Manufacturers, a research report on the industrialized housing industry, in 1980, a poor year for the housing industry, approximately 155,000 manufactured units were erected in the United States, nearly 1,000 of them in New Jersey. In 1980, 510 factory-built housing units were produced by manufacturers located in New Jersey.

The major types of manufactured homes are modular/sectional homes, pre-cut homes and panelized homes. A modular/sectional home is generally described as a three-dimensional housing unit produced in a plant and designed for erection on a permanent foundation with a minimum of on-site labor. Most are made for shipment to the site in two or more sections. A pre-cut house is a manufactured house package for which the many parts are pre-cut but not pre-assembled. A panelized house differs in that it is partially assembled in the factory, then shipped as a package to the site where assembly is completed on the foundation. It includes wall panels and may include other items such as roof systems, floor systems, plus a wide variety of building materials and equipment. Deck House produces panelized homes. The Deck House received by the purchaser includes the exterior shell, the interior wood trim, doors, baseboard, bookcases and cabinets. It does not include sheet rock, electricity, plumbing, heat, painting, floor covering, foundations (which generally are installed before deliv-

ery of the Deck House components), landscaping, masonry for the fireplace, the floor slab, and appliances. These non-included items are generally provided or subcontracted for by the building contractor whom the purchaser retains to erect the house.

More than 4,000 Deck Houses have been built throughout the country, and nearly 150 have been built in New Jersey since the company's inception in 1960, mostly in the less developed areas of the state. Five or six Deck Houses are now under contract awaiting shipment to New Jersey purchasers.

Typically, a Deck House sale is effected as follows: the prospective customer and a Deck House representative visit the proposed home site and discuss the customer's requirements. If the customer is interested in proceeding, he signs a pre-contract service agreement. The pre-contract service agreement authorizes the company, for a service fee, to prepare sketches and/or drawings for a Deck House. There are three types of pre-contract service agreements, depending on the degree to which a standard Deck House plan (of which there are more than fifty) must be modified, and the company's service fee varies accordingly.

If the customer selects an existing plan and makes minor modifications, pre-contract service agreement No. 1 will be used, calling for a non-refundable service fee of $700.

If the customer takes an existing plan and makes major modifications, pre-contract service agreement No. 2 will be used, calling for a $1,000 service fee. If the customer's requirements are nothing like an existing plan and Deck House must essentially start from scratch, pre-contract service agreement No. 3 will be used, providing for a service fee of $2,000. Under both No. 2 and No. 3, if the sketches are not approved by the customer, a portion of the service fee is refunded. Under all three agreements, if the customer elects to proceed with construction, the service fee is applied against the cost of the component package.

In a typical case sketches are made by employees in Deck House's design department, located at the company's headquarters in Acton, Massachusetts. They are not architects certified by the New Jersey Board of Architects and, in fact, at the present time are not architects at all. When the customer approves the sketches, detailed scaled drawings are prepared. This function, too, is not performed by architects certified by the Board of Architects of New Jersey. When all modifications requested by the customer have been completed, and if the state in which the house is to be erected so requires, the final drawings are sent to a licensed architect of the state for review and approval.

New Jersey does require that a licensed architect sign and seal the drawings before a building permit can issue. Deck House has retained Laibow, a registered New Jersey architect, for this purpose. Laibow may approve these drawings as prepared or, if necessary, require that further modifications be made. For example, Laibow has returned drawings to the company for redrafting to conform with the requirements of the Small Dwelling Energy Subcode, N.J. A.C. 5:23–3.8(a)(3).

Laibow certifies only the plans for the portion of the building for which Deck House is responsible, essentially the building from the floor up. His certification does not cover such items as the foundation, walls and footings. The plans note that such work is performed "by others". It is attended to by the building contractor hired by the purchaser. Laibow does not view the construction site and has no role in the location of the building on the site or testing the soil. His certification is sufficient to satisfy building inspectors, and they issue permits on the basis of plans bearing his certification.

If the customer wishes, the Deck House representative will introduce him to a local builder, usually one who has erected a Deck House before. The builder has no relationship with Deck House, and the customer is not obligated to use him. The customer enters into a contract with Deck House to

supply the component package and enters into a separate contract with a builder to erect the house.

Typically, the entire package of materials needed to erect the Deck House can be shipped to the builder on two 40-foot trailers. The shell of the house can be erected by the builder in approximately two weeks. Normally it takes three to four additional months for the builder to complete the interior. The Deck House package contains all of the materials necessary to construct the exterior shell of the house and many materials relating to the interior trim.

The process described above is typical of the manufactured housing industry. Most companies, whether they produce panelized, pre-cut or modular houses, offer a stock line of standard plans which can be modified in-house to a greater or lesser extent to meet individual needs. This gives the home-buyer a wider choice of options than if he were selecting a home in a tract of ready-built houses. Yet, even with the personalized line, the cost of a prefabricated home can be less than a standard tract house. This is because manufacturers utilize labor-saving technology and bring many of the more costly functions of home construction indoors. One of the obvious savings is the avoidance of an architect's fee for such a house.

B. *The Events Giving Rise to this Action*: In 1977 and 1978 Deck House and a builder, Gene Godby, were involved in dealings with Theodore Zelinski, who sought to purchase a Deck House structure and who negotiated with Godby with a view to entering into a contract to erect and complete the house. Neither the deal with Deck House nor negotiations with Godby came to fruition and on June 30, 1978 Zelinski wrote to the Secretary of the New Jersey State Board of Architects urging that action be taken against Deck House. This was followed by further communications from Zelinski to the Board demanding that they proceed against Deck House and later against Laibow.

Plaintiffs portray Zelinski as an unreasonable would-be purchaser of a Deck House home exerting pressure against Deck House by seeking to prevail upon the Board of Architects to terminate its ability to do business in New Jersey. Defendants, on the other hand, portray Zelinski as a defenseless New Jersey consumer at the mercy of a seller of homes which were not designed by a New Jersey architect. It is unnecessary for the purposes of this action to decide who is correct. Suffice it to say that Zelinski testified before the Board of Architects in December, 1981; that he was not dissatisfied with the Deck House plans; that he would have proceeded if he could have found a builder who would contract with him; and that his only complaint is that Deck House is violating the law by not using plans prepared by New Jersey architects.

Zelinski is mentioned only because of the role he played in the Board of Architects proceeding.

In any event, on May 14, 1979, nearly eleven months after Zelinski's first letter, the Board of Architects held an informal meeting on Deck House's possible violation of N.J.S.A. 45:3–10. At that hearing the Board took testimony concerning the nature of the manufactured housing industry from Ted W. Cahow, then President of the National Association of Home Manufacturers. Deck House wished to present additional witnesses, and Laibow planned to testify. The hearing proceeded under serious time constraints, as only an hour had been scheduled and the Board wished to hear another case which was scheduled to follow the Deck House case. Consequently, the hearing was adjourned without date and without hearing the remaining Deck House witnesses.

Deck House did not hear from the Board again until June, 1981, more than two years after the hearing. By letter dated June 17, 1981 the Board notified Deck House that, despite the fact that the informal hearing had never been concluded, it had "voted unanimously to reaffirm its conclusion" that Deck House was guilty of violating N.J.S.A. 45:3–10, for practicing architecture without a license. Deck House was offered

an opportunity to "settle" the matter by acceding to terms which, in effect, required it to cease and desist from conducting business in New Jersey. By letter dated June 3, 1981, Laibow was advised that he appeared to have been guilty of aiding and abetting Deck House. Laibow was also offered a "settlement", including a $500 fine and an agreement that he would no longer review plans for Deck House. Alternatively, he was given the right to request a formal hearing, which he did. By letter dated August 11, 1981 the Board set down the matter for a formal hearing on September 24, 1981. Although the Board's communication to Deck House did not advise it that it too had a right to a hearing, it was agreed by the parties that the hearing would also encompass Deck House's objections to the Board's proposed action.

The hearing was adjourned until December 17, 1981.

On December 15, 1981 plaintiffs filed their action in this Court. The relief sought was: (i) a judgment declaring that defendants' proposed interpretation and application of N.J.S.A. 45:3–10 is illegal, (ii) an order preliminarily and permanently enjoining defendants from proceeding against Deck House or in any way interfering with the manner in which it conducts its business, (iii) an order preliminarily and permanently enjoining defendants from proceeding against Laibow in connection with his review and approval of plans for Deck House, and (iv) attorney's fees and costs of suit.

At the time the complaint was filed, plaintiffs sought a temporary restraining order which included a restraint upon holding the hearing scheduled for December 17, 1981. I declined to restrain the hearing but, pending an evidentiary hearing on plaintiffs' application for a preliminary injunction, I restrained interference with Deck House's business in New Jersey and enforcement of any determination resulting from the December 17th hearing before the Board of Architects.

The hearing of plaintiffs' application for a preliminary injunction and defendants'

motion to dismiss for failure to state a cause of action was held on December 22, 1981.

C. *The State Agency and Procedures*: The New Jersey State Board of Architects consists of "five members, all of whom shall be architects residing in this State and shall have been engaged in the practice of their profession for at least ten years". N.J.S.A. 45:3–1. These members are appointed by the Governor, who "shall give due consideration to, but shall not be bound by, recommendations submitted by the appropriate professional organizations of the State", N.J.S.A. 45:1–2.2. At the present time there is one vacancy in this category of members. In addition, the State Board includes two members whom the Governor appoints "to represent the interests of the public". The public members shall not "have any association or relationship with the profession or a member thereof regulated by the Board of which he is a member, where such association or relationship would prevent such public member from representing the interest of the public". N.J.S.A. 45:1–2.2(b). Further, the Board of Architects has one member, designated by the Governor, who is the head of, or a holder of an office in, a department in the Executive Branch which is deemed clearly related to the Board of Architects. N.J. S.A. 45:1–2.2(c).

Among the duties of the Board of Architects is licensing architects to practice in New Jersey and enforcing statutes and regulations governing the practice of the profession in this State. Among the statutes which the State Board is required to enforce is N.J.S.A. 45:3–10, which provides, in part:

Any person who shall pursue the practice of architecture in this State, or shall engage in this State in the business of preparing plans, specifications and preliminary data for the erection or alteration of any building, except buildings designed by licensed professional engineers incidental or supplemental to engineering projects, or use the title architect or registered architect, or shall advertise or use

any title, sign, card or device to indicate that such person is an architect, without a certificate thereof or while his certificate is revoked, suspended or forfeited in accordance with the provisions of this chapter, or any person aiding or assisting such person not having a certificate to practice architecture or while his certificate to practice architecture is revoked, suspended or forfeited, or any person who violates any provision of this act or any rule or regulation of the board shall be liable to a penalty . . . .

The Board of Architects has broad powers to investigate possible violations of the applicable statute and regulations. It may require persons to file information with it; it may examine witnesses under oath; it may inspect premises; and it may examine books and records. N.J.S.A. 45:1–18. It is, of course, under no duty to notify the persons being investigated of the nature and extent of its investigation.[1]

In the present case, the Board of Architects exercised its powers to investigate the activities of Deck House and Laibow. The investigation consisted not only of the abbreviated informal hearing held May 24, 1979; the Board or its representative also obtained information from Zelinski and, upon the request of the Board, an investigator conducted an investigation of the municipal files relating to certain Deck House structures erected in New Jersey. The Chief of the Enforcement Bureau of the Division of Consumer Affairs sent the reports resulting from that investigation to the Board of Architects between the date when the Board had notified plaintiffs that evidence showed that they had violated N.J.S.A. 45:3–10 and the date when plaintiffs were to be heard on the charge.

Having concluded that the evidence showed that the plaintiffs had engaged in, or abetted, the unlawful practice of architecture, various options were available to the Board of Architects. It had the power to revoke or suspend Laibow's license. N.J.S.A. 45:1–21. It was entitled to impose lesser penalties, after affording an opportunity to be heard. N.J.S.A. 45:1–22. It was empowered to seek injunctive relief and civil penalties in the New Jersey Superior Court. N.J.S.A. 45:1–23. In the present case the Board opted for the lesser penalties and hearing approach.

Having chosen to proceed by this route, the Board of Architects had the further option of hearing the matter itself or requesting that it be heard by an Administrative Law Judge. N.J.S.A. 52:14F–8. The Board of Architects decided to retain jurisdiction and hear the case. Its attorney explained that the Board was motivated by the wish to avoid delay and by the fact that the Board members did not "feel comfortable" with an administrative law judge who would not be as familiar as they with the technicalities in the field of architecture.

Disciplinary hearings by the Board are authorized by the Uniform Enforcement Act, N.J.S.A. 45:1–14 et seq., and are governed by the New Jersey Uniform Administrative Procedure Rules, N.J.A.C. 1:1–1, et seq.

These rules have been adopted pursuant to N.J.S.A. 52:14F–1 et seq., and are in accord with the requirements of the New Jersey Administrative Procedure Act, N.J.S.A. 52:14B–1 et seq. The rules state that:

> This chapter shall govern the conduct of all contested cases in the Executive Branch of the State Government, whether by the Office of Administrative Law or by the agencies themselves pursuant to statute.
>
> N.J.A.C. 1:1–1(a).

Under the rules, a "contested case" is a "proceeding . . . in which the legal rights, duties, obligations, privileges, benefits or other legal relations of specific parties are

---

1. The Deputy Attorney General representing the defendants described the range of the Board of Architects' duties at the December 17, 1981 hearing before the Board. "This Board has more than a dual function, a triple or quadruple function, one of which is to authorize investigations; a second is to evaluate investigations; and a third is to try the final matter. This is not a scandal, and there is nothing wrong with it, and it is authorized by the Legislature, and it has been upheld by the courts." Transcript, at page 198.

required by constitutional right or by statute to be determined by an agency, by decisions, determinations, or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing". N.J.A.C. 1:1–1.4. The charges against Deck House and Laibow fall within this definition. The nature and characteristics of a contested case are set forth in N.J.A.C. 1:1–1.5 and 1:1–1.6. In general, a contested case is similar to a case or controversy with which a court is accustomed to dealing.

The rules further provide that "[a]fter an agency proceeding has been commenced and issue has been joined, the agency shall forthwith determine whether the matter is contested . . ." and "[w]hen the agency determines that the case is contested, it shall either file it forthwith with the Clerk of the Office of Administrative Law in the manner provided by N.J.A.C. 1:1–5.2 or retain it under the provisions of N.J.S.A. 52:14F–8 or N.J.A.C. 1:1–5.4 and notify all parties of the decision to retain". In the present case the Board of Architects now asserts that it determined that the charges against Laibow were contested when it sent its June 3, 1981 letter to him, and that it determined that the charges against Deck House were contested when it sent its June 17, 1981 letter to it stating that the Board had concluded that it had violated N.J.S.A. 45:3–10, i.e., "Corporation practicing architecture in this state; preparation of plans while not holding a license as an Architect in New Jersey." The letter to Deck House did not advise Deck House it was entitled to a hearing; the letter to Laibow did so advise him. In any event, the Board of Architecture now contends that these letters constituted the required notice to Deck House and Laibow of its decision to retain jurisdiction of the case rather than to refer it to an administrative law judge. This was articulated for the first time at the hearing on plaintiffs' application for a preliminary injunction and has a slight ring of an afterthought, but I accept the letters as meeting the substance of N.J.A.C. 1:1–5.1's requirement of a determination and notice.

Once an agency determines that a proceeding before it is contested and that it will retain jurisdiction to hear it, the manner in which the agency may deal with the proceeding is dramatically curtailed. Even though the matter is still before the agency, the agency is required to treat it in the same manner as if it were being adjudicated by an administrative law judge. Although a certain informality is permitted and, in fact, encouraged, the essential properties and procedure of a judicial proceeding are mandated. The events which took place in the present case after it had become contested in June of 1981 illustrate how difficult, if not impossible, it is for an administrative agency such as the Board of Architects to perform its adjudicative function.

For example, N.J.A.C. 1:1–3.2 provides that:

> Hearings . . . in contested cases shall proceed with all reasonable expedition and, to the greatest extent possible, shall be held at one place and shall continue, except for brief intervals of the sort normally involved in judicial proceedings, without suspension until concluded.

That will be utterly impossible in the present case. The members of the Board of Architects, for the most part, contribute their services. The Board meets once or twice a month and might be able to schedule special meetings. However, it must also conduct its regular business. If plaintiffs are to present the factual basis for their constitutional and antitrust defenses in order to create the necessary record for judicial review by the state courts, many days of hearings will be required. With the best of intent the Board will not be able to conduct a hearing which will continue without suspension.

As a further example, N.J.A.C. 1:1–3.8 provides that:

> Neither a judge nor an agency head in any contested case . . . may initiate or consider ex parte any evidence or communications concerning a pending or impending proceeding.

The Board of Architects violated this mandate after June, 1981 when this case became contested. The Board had initiated the investigations of other Deck House homes before June, 1981, but it received reports thereafter. Long after the case became contested the Chairman of the Board of Architects initiated an investigation of a Deck House home being constructed in Montclair, and only days before the December 17th hearing a report was filed with the Board. Neither Deck House nor Laibow was informed of these *ex parte* investigations by the body that was hearing the case against them.

> Further, N.J.A.C. 1:1–3.8 provides that:
>
> The rules and standards contained in the New Jersey Court Rules governing the conduct of lawyers . . . shall govern the conduct of lawyers . . . appearing in or processing contested cases . . .

This is a provision with which it is virtually impossible to comply when a hearing is conducted by the agency itself. In the present case a Deputy Attorney General was assigned to represent the Board of Architects, a practice followed generally with all agencies. It was he who advised the Board with respect to Zelinski's initial charges and with respect to the May, 1979 hearing. It must have been he who advised the Board as to the meaning of the applicable statute and as to the basis for the charges which the Board brought against the plaintiffs.

The same attorney now appears before the Board prosecuting the very same charges as to which he advised the Board, and the Board is supposed to adjudicate impartially between him and the plaintiffs. The New Jersey Court Rules would not sanction this relationship in a judicial proceeding, *e.g.,* Disciplinary Rule 7–110(B), Code of Judicial Conduct, Canon 3 C(1)(a). When asked about this, the Deputy Attorney General candidly acknowledged that this type of situation poses recurring problems when agencies conduct their own hearings. The Attorney General's Office attempts to solve the problem by assigning another Deputy Attorney General to advise

the Board with respect to the matter being heard and by instructing the Deputy Attorney General prosecuting the hearing to refrain from discussing the subject matter of the hearing with members of the Board. This practice supposedly is being followed in this case. It is hardly an answer to the problem.

An examination of the transcript of the first day of the Board of Architects' hearing discloses that this solution does not have the effect of erasing from the minds of the members of the Board the fact that one of the attorneys appearing before them was long considered the Board's legal adviser. At one point one of the Board members asked to consult off the record with the Deputy Attorney General, which, with the consent of plaintiffs' attorney, he did. (Transcript, page 199.) Shortly afterward there was an argument over the admission of an exhibit. The colloquy between the Board and the Deputy Attorney General shows that the Board was unclear whether the Deputy Attorney General was objecting to the exhibit or giving it legal advice. One receives the distinct impression that if the Deputy Attorney General persisted in his objection the Board members would acquiesce in his views, particularly as they were not lawyers and had no one else to advise them. (Transcript, pages 199–203.)

These observations are not intended as criticisms of either the Board of Architects or of the Deputy Attorney General who advised them. The difficulties are inherent when the Board attempts simultaneously to act both as a hearing body and as an administrative agency charged with the duty of regulating the conduct of architects. In the present case the high standards for adjudicative proceedings prescribed by the New Jersey Uniform Administrative Procedure Act are, to a significant degree, incompatible with the performance of the Board of Architects' administrative duties.

In any event, the Board of Architects held a hearing on December 17, 1981. Future hearing days will be scheduled and presumably the matter will be decided by the Board. If the decision is adverse to

plaintiffs they will have the right of appeal on the record to the Appellate Division of the New Jersey Superior Court. N.J. Court Rule 2:2–3(a)(2). Further appeal to the New Jersey Supreme Court might thereafter exist as of right, N.J. Court Rule 2:2–1(a), or by leave of the Court, N.J. Court Rule 2:12.

D. *Related State Court Litigation*: There is pending in the New Jersey Superior Court an action which may affect the outcome of the Board of Architects' proceeding against plaintiffs. The action is entitled *State of New Jersey Board of Architects v. Scott C. Lepley and Oliver H. Marron*, Superior Court of New Jersey, Chancery Division, Ocean County, Docket No. C–1004–80. The facts are set forth in a bench opinion of Judge Henry H. Wiley given on March 25, 1981.

Lepley was a graduate of an architectural school but not yet licensed as an architect in New Jersey. Marron was a licensed New Jersey architect. The two of them formed an association in which Lepley worked as a student or apprentice for Marron. In practice, Lepley prepared plans and after they were completed Marron reviewed them and then signed and sealed them. There was no charge that Lepley misrepresented his status or that the plans in any way violated New Jersey requirements.

The Board of Architects, proceeding in a summary manner under N.J.S.A. 45:1–23, sought to restrain Lepley and Marron from conducting business in that fashion.

Judge Wiley noted "that the purpose of these Statutes is to prevent the public from being misled or deceived or damaged by having someone who doesn't have the proper qualifications to engage in the occupation for which the license is to be applied for". He concluded that there had been no proof "of a violation of the Statute, at least not its purpose where the purpose is to protect the public". He found that Lepley was a "student" and therefore within the exception contained in N.J.S.A. 45:3–10.[2]

Thus, Marron's certification of the drawings was permissible under the specific terms of the statute. "Student" was given a broad meaning to include a person who had graduated from architectural school but who has not yet received his license.

The New Jersey trial court barred the defendants from using the name "Marron-Lepley Architectural Designers" until Lepley passes the architectural examination, although it stated that "Marron-Lepley Designers" or "Marron-Lepley Builders" would be permissible. The Court refused to impose a fine, denied the Board of Architects' request for injunctive relief, and dismissed the complaint.

The judgment in the *Lepley-Marron* case is on appeal to the Appellate Division of the Superior Court. All briefs have been filed and the parties are awaiting argument.

### The Law

A. *Jurisdiction*: The grounds for plaintiffs' attack upon the action of the Board of Architects are the following:

(i) The Board's interpretation and application of N.J.S.A. 45:3–10 would discriminate against or place an excessive burden on interstate commerce in violation of the Commerce Clause of the United States Constitution, Article I, Section 8.

(ii) The Board's action, if enforced, would constitute a restraint of trade in violation of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*

(iii) The Board's action, if enforced, would constitute a restraint of trade in violation of the New Jersey Antitrust Act, N.J.S.A. 56:9–1 *et seq.*

(iv) The Board's action, if enforced, would constitute a deprivation of plaintiffs' federal rights by persons acting under color of state law in violation of 42 U.S.C. § 1983, and

---

**2.** Nothing herein contained shall prohibit students who are employees of licensed architects from acting upon authority of such licensed architects ... where said student or employees are under the immediate supervision of such licensed architect.....
N.J.S.A. 45:3–10.

(v) The Board's actions in this matter are the result of institutional and actual bias such as to deprive plaintiffs of due process of law in violation of the Fourteenth Amendment.

The Court has jurisdiction over these claims by reason of diversity of citizenship of the parties, the amount in controversy exceeding $10,000 exclusive of interest and costs. 28 U.S.C. § 1332. Further, the action arises under the Constitution and Laws of the United States and thus there is federal question jurisdiction. 28 U.S.C. § 1331. Defendants urge, however, that in the circumstances of this case the Court's unquestioned jurisdiction should not be exercised.

B. *Younger Abstention*: Initially defendants argued that the principles first articulated in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), as developed during the succeeding decade, require dismissal of this action. Defendants note that an important state interest is involved and that at the time this action was instituted there was a pending state administrative proceeding dealing with the issues of this case. It follows, they contend, that this Court must abstain and dismiss this action.[3]

■ There is no need to recount once again the expansion of the *Younger* doctrine from its original application to state criminal proceedings to its recent application to state administrative proceedings. Suffice it to say its furthest extension is found in the Third Circuit opinion in *Williams v. Red Bank Bd. of Ed.*, 662 F.2d 1008 (3d Cir. 1981). There, the Court held that if three carefully delineated criteria were met, a district court should abstain if state administrative proceedings were pending. The Court of Appeals spelled out these criteria with such care one concludes that *Williams* represents the furthest reach to which *Younger* abstention can properly be carried. If a federal court were to carry

the doctrine further, it would be abdicating its preeminent duty to protect important federal constitutional and statutory rights.

The three criteria which the Court of Appeals set forth for abstention in the case of state administrative proceedings were: (i) the state proceedings reflect strong and compelling state interests; (ii) the state proceedings are adequate to vindicate federal claims, and (iii) federal intervention into state administrative proceedings would be substantial and disruptive.

In the present case plaintiffs argue that the state interests involved are not compelling. The state's interest in the regulation of professions and occupations, they suggest, is not sufficiently important to justify abstention, citing *Rite Aid Corp. v. Board of Pharmacy of the State of New Jersey*, 421 F.Supp. 1161 (D.N.J.1976), *app. dism'd*, 430 U.S. 951, 97 S.Ct. 1594, 51 L.Ed.2d 801 (1977). They contrast this interest with the more vital interest in education which was the subject of the *Williams* case, *see Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). While education may be more important in the scale of values than regulating professions, a state does have an important interest in licensing and disciplining professionals serving the public. In proper circumstances abstention might be appropriate in that area of regulation. *Gipson v. New Jersey Supreme Court*, 558 F.2d 701 (3d Cir. 1977) (*per curiam*).

The present case, however, fails to meet *Younger* abstention criteria in that the state proceedings quite clearly are not adequate to vindicate federal claims.

In *Williams* the Court of Appeals emphasized the nature of the proceeding before the administrative law judge to which the district court deferred by abstaining, finding it adjudicatory in nature. The statute creating and governing New Jersey's Office of Administrative Law provides a structure which insures that administrative law

---

**3.** Although plaintiffs contend that the Board of Architects cannot properly hear this case because of institutional and actual bias, there is no allegation and no evidence of official mis-

conduct which would bring the case within the "bad faith and harassment—official lawlessness" exception to *Younger*. *Herz v. Degnan*, 648 F.2d 201 (3d Cir. 1981).

judges will be judges and not regulators. They are full-time professionals (usually, but not always, lawyers); they do not hear matters in which they were previously involved as administrators; under detailed regulations, they conduct themselves and their proceedings as judges would conduct a trial. In short, there should be little to distinguish a proceeding before an administrative law judge from a judicial proceeding. The Court of Appeals held, in *Williams*, that in such circumstances the plaintiff would be afforded an opportunity to pursue her constitutional claims in an ongoing state proceeding.

Such is not the case in the present action. The Board of Architects is not a tribunal in which plaintiffs should be required to defend their federal rights. It is not enough that plaintiffs would have an ultimate appeal to the New Jersey courts. In complex Commerce Clause cases and in cases involving the antitrust laws the fact-finding process can be critical and should, as in *Williams*, take place before a truly adjudicatory body.

The fact which colors everything that happens before the Board of Architects is that most of the members are architects, and architects in general have an interest in the outcome of this proceeding. The business in which Deck House is engaged threatens economic interests of the profession. From the evidence presented to date it appears that Deck House sells high quality, relatively expensive homes. They are the kind of houses in connection with which one might well employ an architect if manufactured houses were not available. There is no evidence to date that these houses are defective in any way.[4] It is not unreasonable to conclude that a rapid growth in the manufactured house industry into the field of both low-cost and high-cost homes will have an adverse economic effect upon the architectural profession.

It may well be that none of these considerations would have any influence upon the members of the Board of Architects hearing the case against plaintiffs, but the possibility is there and the appearance of partiality cannot be dispelled either in the minds of the parties to the proceeding or the public. Were this a judicial proceeding, there is no doubt the judge would disqualify himself. What makes the situation even more disturbing is the fact that the Board of Architects had the opportunity to refer the case to an impartial tribunal, an administrative law judge, and that they rejected that course of action in part, at least, because they did not "feel comfortable" with an administrative law judge.

This is not the kind of hearing tribunal in which a litigant should be compelled to defend his federal rights. *Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); *Rosko v. Pagano*, 466 F.Supp. 1364 (D.N.J.1979).

Even apart from the obvious interest of architects, the proceedings before the Board are insufficiently adjudicatory in nature to meet the standards set forth in *Williams* for a proceeding adequate to vindicate federal claims. The New Jersey Administrative Procedure Rules, N.J.A.C. 1:1–1.1, *et seq.*, are applicable to hearings in contested cases whether they be before an administrative law judge or before an agency or board. Of necessity, however, the hearings will be very different in nature if they are held by the agency rather than by an administrative law judge. Earlier in this opinion I described how the proceedings before the Board of Architects has departed from judicial standards and from standards which the administrative procedure rules seek to maintain. In summary: The Board has had continuing involvement with the Deck House-Laibow situation since before May, 1979 and has already concluded that there

---

**4.** Complainant Zelinski found no fault with the plans which he acquired from Deck House and would have proceeded if he could have made arrangements with a builder. The Board of Architects' *ex parte* investigation of a suspected collapse of the foundation of a Deck House residence disclosed that the foundation, which, in any event, was not a Deck House responsibility, had not collapsed. The builder had noticed a crack, knocked down the foundation and replaced it.

has been a violation of the statute. Since the date when the case became contested the Board has had *ex parte* involvement with matters relating to the case; the members of the Board who are architects are skilled professionals, but it does not appear that any members of the Board have the legal training to deal with the complicated questions raised by plaintiffs' federal claims; the Board is unable to proceed with an uninterrupted hearing; the attorney who opposes plaintiffs before the Board was the attorney who advised the Board from the inception of the controversy and in connection with the charges the Board has made against plaintiffs. While the "concentration of inquisitorial, prosecutorial and judicial power" is not fatally defective on constitutional grounds in all situations, *e.g., In re Information Resources*, 126 N.J. Super. 42, 312 A.2d 671 (App.Div.1973), it does, in this case, at least, preclude *Younger* abstention.[5]

Since I have concluded that the nature of the state proceedings makes *Younger* abstention inappropriate, it is unnecessary to address the third criteria for abstention, that federal intervention into state administrative proceedings would be substantial and disruptive. I simply point out that in view of the conclusions which I reach on other issues in the case, failure to abstain should result in no substantial, much less disruptive, intervention into the pending state proceeding.

C. *Pullman Abstention:* Defendants urge that even if abstention on *Younger* grounds is not appropriate the Court should abstain for the reason that there are unresolved questions of state law which, once decided by the New Jersey courts, might eliminate the federal constitutional and statutory questions raised in this action. *Railroad Commission v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Defendants point not only to the proceeding

before the Board of Architects but also to the *Lepley and Marron* case, which could result in a court ruling which would validate plaintiffs' actions which the Board has challenged.

There are at least two questions of statutory interpretation which have not been decided by the New Jersey courts.

█ N.J.S.A. 45:3–10 proscribes the practice of architecture "in this state" or engaging "in this state" in the business of preparing plans, specifications and preliminary data for the erection of any building without certification by the New Jersey State Board of Architects. Whether Deck House's preparation of plans and specifications in Massachusetts and the distribution of such plans and specifications in connection with the sale of manufactured houses erected in New Jersey and elsewhere throughout the United States constitutes the practice of architecture in New Jersey within the meaning of N.J.S.A. 45:3–10 is a question which can only be resolved by the New Jersey courts.

One federal court dealing with circumstances quite different from the circumstances in the present case held that a Maryland architectural corporation which prepared plans and specifications for a New Jersey resident for a building to be constructed in New Jersey and which had them certified by an employee who was a New Jersey architect, had violated N.J.S.A. 45:3–10. The Court concluded that New Jersey law prohibits the practice of architecture by a corporation and it prohibits the practice of architecture by a person who is not licensed in New Jersey. It found that the procedures used by the Maryland corporation were an illegal subterfuge designed to evade New Jersey's law and, as such, precluded recovery of compensation for architectural services. *Dalton, Dalton, Little, Inc. v. Mirandi*, 412 F.Supp. 1001 (D.N.J. 1976).

---

5. The problem of abstention when a state administrative proceeding involves prosecutorial as well as adjudicative elements was addressed in *Garden State Bar Ass'n v. Middlesex Co. Ethics Comm.*, 643 F.2d 119 (3d Cir.), *reh. denied*, 651 F.2d 154 (3d Cir. 1981), *cert. granted,*

—— U.S. ——, 102 S.Ct. 500, 70 L.Ed.2d 377 (1981). The deficiencies in the proceedings in the present case precluding *Younger* abstention are far more serious than the deficiencies which the Court found precluded abstention in the *Garden State Bar Ass'n* case.

Another federal court held that a Florida statute defining real estate brokers as persons who shall "in this state" agree to perform certain services "was not intended to reach persons who rendered brokerage services outside of Florida" in connection with Florida real estate. *Lucas v. Gulf & Western Industries, Inc.*, 666 F.2d 800 (3d Cir. 1981).

Neither of these cases, of course, controls the meaning to be given to the language of N.J.S.A. 45:3–10. They simply suggest that the meaning is not free from doubt and that New Jersey courts might well construe it in a manner which would eliminate some or all of the federal questions as to Deck House's activities in New Jersey.

Similarly, the New Jersey courts might construe the statutes in a manner which would validate Laibow's practice of reviewing Deck House's plans and certifying them if he found them to be in compliance with all New Jersey and other applicable requirements and standards. At least one court has held such a review and certification to constitute "preparation" of plans, obviating the necessity of completely redrawing plans prepared by someone else in order to meet statutory requirements. *Medlin v. Florida State Bd. of Architecture*, 382 So.2d 708 (Fla.Dist.Ct. of App.1979). The decision of Judge Wiley in the *Lepley and Marron* case suggests the possibility of a similar result in New Jersey.

The *Pullman* doctrine requires that the state courts be given an opportunity to decide the state law questions before the federal court addresses the federal questions and in the process adopts a possibly erroneous interpretation of the state statutes. To accomplish this end, I will stay proceedings in this case to give the parties an opportunity to complete the proceeding before the Board of Architects and, if any party elects to do so, to pursue appropriate appeals in the state courts. Plaintiffs have the option of reserving their right to litigate the federal questions here by recording the appropriate reservation of that right in the state proceedings, *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). I will reserve jurisdiction in the event it becomes necessary to deal with the federal questions.

D. *Interim Relief*: Having decided to stay proceedings in this Court, it becomes necessary to determine whether interim relief is appropriate in order to prevent any federal rights from being lost while the state proceedings are being pursued.

The question whether preliminary injunctive relief should be granted in a *Pullman* abstention case was addressed in *New Jersey-Philadelphia, Etc. v. N.J. State Bd.*, 654 F.2d 868, 887 (3d Cir. 1981).

Since ... a grant of pendente lite relief is not a final interpretation of state law by a federal court and leaves a state court entirely free to place any construction on its law, limiting or otherwise, which it determines to be consistent with the first amendment [in this case the Commerce Clause], *Pullman* considerations have very little weight at the preliminary injunction stage. Once the court has concluded that an immediate dismissal on *Younger* grounds is inappropriate, a motion for preliminary injunctive relief, especially in first amendment contexts, ought, we think, to be considered without regard to the separate question whether a *Pullman* stay of final hearing is appropriate. Assuming the case is not to be dismissed outright, the district court should be guided by the classic requirements for a preliminary injunction:

The traditional standard for granting a preliminary injunction requires the plaintiff to show that in the absence of issuance he will suffer irreparable injury and also that he is likely to prevail on the merits.

I first address the question whether plaintiffs are likely to prevail on the merits.

1. *Burden on Commerce*: I conclude, on the basis of the evidence before me, that if the Board of Architects grants the relief it seeks against plaintiffs it will have imposed an unconstitutional burden upon in-

terstate commerce. The manufactured housing industry is relatively new. It ranges from housing which is nothing more than a mobile home with the wheels removed to very substantial luxury-type homes such as some of those which Deck House sells. Like other industrial goods, they are manufactured in a central location and from there shipped to many parts of the United States. It is truly interstate commerce. It has the potential of providing people with houses of known quality at reduced prices. Costs can be cut by large-scale purchases of materials, continuous production, standardization of components, and avoiding repetitive services such as the services of an architect to design each house from scratch.

It is clear that the effect of the Board of Architects' interpretation and application of N.J.S.A. 45:3–10 would be to prevent Deck House from continuing to ship its houses into New Jersey as it now does. It might have the effect of preventing sales in New Jersey altogether; at best, it would add significantly to the cost of the houses sold in New Jersey. What the Board is really requiring is that Deck House retain an independent New Jersey architect to prepare anew the plans and specifications for each house sold in New Jersey.

Defendants evade the issue by asserting that it would be a simple matter for Deck House to arrange for a Massachusetts architect to be licensed in New Jersey, in view of New Jersey's liberal licensing requirement. The Board is also charging that Deck House is practicing architecture in corporate form. Thus, it would do no good for Deck House to hire an architect. Its employee, although licensed as a New Jersey architect, would not be permitted to certify drawings, since that would constitute a corporation practicing architecture. Further, whether an architect is an employee or an outside professional, Deck House would be put to the expense of retaining a New Jersey licensed architect to redraw old plans for each sale of a house in New Jersey. This would replace the present practice of having a New Jersey architect certify that the old plans, as modified to meet a particular cus-

tomer's tastes, meets New Jersey requirements.

At this time there is no evidence from which it can be determined whether the Board intends to pursue this policy against all sellers of manufactured homes located outside of New Jersey, whether the Board intends to act against New Jersey manufacturers of homes who do not have New Jersey architects prepare totally new drawings for each standard home they sell, and whether the Board intends to move generally against New Jersey architects who certify for contractors, home owners and others plans which they or their employees had not drawn from scratch. These questions must abide future discovery in the federal action. All that is before the Court at this point in the proceeding is the effect of the Board of Architects' proposed action on a single seller of manufactured houses.

The United States Supreme Court has described the objectives which it has sought to achieve in determining whether state legislation or regulation unduly burdens commerce in violation of Article I, Section 8 of the United States Constitution:

Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs, duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality.

*Hood & Sons v. DuMond*, 336 U.S. 525, 539, 69 S.Ct. 657, 665, 93 L.Ed. 865 (1949).

There are insufficient facts in the record to conclude at this time that the Board's action would have the effect of prohibiting totally the sale of Deck Houses in New Jersey, which would, of course, violate the Commerce Clause. *e.g., Philadelphia v.*

*New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). Nor can it be determined from the present record whether the Board's actions would have the effect of discriminating against out-of-state sellers of manufactured houses in favor of New Jersey manufacturers of such houses, which would also be a clear violation of the Commerce Clause, *e.g., Toomer v. Witsell*, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948).

The inquiry in the present case on the record as it now stands is whether the proposed action of the Board of Architects would impose an undue burden on commerce. This "inquiry involves a sensitive consideration of the weight and nature of the state regulatory concerns in light of the extent of the burden imposed on the course of interstate commerce". *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 441, 98 S.Ct. 787, 794, 54 L.Ed.2d 664 (1978).

The potential burdens on commerce resulting from the requirements which the Board seeks to impose are very great. It might well prevent Deck House alone from doing business in New Jersey and, if not, it would add measurably to its costs and to the prices paid by consumers. If the Board's policies were applied to all sellers of such homes, not just to Deck House, the industry would be deprived of, or penalized in, a significant part of its market, the State of New Jersey. This is what the Commerce Clause, as interpreted by the Supreme Court, prohibits.

The Board of Architects certainly has a legitimate interest in regulating the profession. From the perspective of the public, it is clearly in its interest that only qualified persons practice as architects in New Jersey. What is proposed to be done in this case, however, goes far beyond assuring that only qualified persons be licensed as architects in this state. If the actions of the Board are for the purpose of assuring that homes in New Jersey will be safe and well-built, they go far beyond what is necessary for that purpose. According to the testimony only about three per cent of the homes built in the United States are built with the services of an architect. Obviously the safety and quality of the remaining 97 per cent of the homes have to be assured by other means. There is not the slightest suggestion in the record that Deck House homes are unsafe or of inferior quality. In fact, all the evidence is to the contrary. If the Board is concerned that the foundations, the location of the houses on their sites, or any other matters are not adequately checked, surely there are other ways to solve those problems in lieu of requiring a New Jersey architect to redraw old plans every time a Deck House is sold to a New Jersey resident.

In short, I conclude that plaintiffs are likely to prevail on the merits and establish that the Board of Architects' proposed action would unduly burden commerce.

2. *Antitrust Violation*: Having concluded that plaintiffs are likely to prevail on the merits of one of their federal claims, it is unnecessary to decide whether they are likely to prevail on their other federal claims.

The principal other federal claim is plaintiffs' antitrust charge. The initial inquiry as to that claim is whether defendants are entitled to antitrust immunity under the principles set forth in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). To be entitled to such immunity, "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the state itself." *California Liquor Dealers v. Midcal Aluminum*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980); *see also, National Soc. of Professional Engineers v. U. S.*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). It is not necessary at this time, however, to pursue that inquiry.

3. *Other Equitable Considerations*: Deck House would suffer irreparable injury if the Board of Architects' proposed actions were implemented. It cannot be determined at this time whether it would be driven out of New Jersey or whether it would be able to continue under significant but not presently measurable burdens.

Continuation of the restraint which prevents defendants from implementing any penalty they might impose upon plaintiffs would not harm them in any way. The Board has been reviewing this matter for more than two and one-half years without any ill effects, and there is no reason to believe that further delay will injure anyone.

The interests of the public would seem to be served by encouraging rather than discouraging this alternative source of less-expensive, quality housing. Continuation of the restraints would, therefore, serve the public interest.

Thus, the traditional equitable considerations suggest that a preliminary injunction should be granted to prevent action by the Board of Architects which would irreparably injure plaintiffs, in violation of their federal rights.

*Disposition of Pending Applications*

For the reasons set forth in this opinion, defendants' motion to dismiss the complaint for failure to state a cause of action will be denied.

A preliminary injunction will be entered enjoining defendants, until further order of this Court, from enforcing any disciplinary actions, penalties or other directions to plaintiffs resulting from proceedings pending against them before the Board of Architects.

Further proceedings in this action shall be stayed until the proceedings before the Board of Architects shall have been completed and until all appeals from the determination of the Board of Architects shall have been decided or until further order of the Court.

The action shall be administratively dismissed with the right of either party to move at any time for restoration of the action to the active calendar.

The Court shall retain jurisdiction to hear emergency applications at any time or to proceed with pretrial proceedings and the trial of the case upon the completion of proceedings in the state courts.