COX CABLE COMMUNICATIONS, INC., Commline, Inc., Cox DTS, Inc., Commline Omaha, Inc., and Cox Cable of Omaha, Inc., Plaintiffs,

v.

Harold D. SIMPSON, Robert Brayton, Duane Gay, James F. Munnelly, Eric Rasmussen, Members of the Nebraska Public Service Commission, and Nebraska Public Service Commission,* Defendants.

Civ. No. 83-L-240.

United States District Court, D. Nebraska.

Aug. 2, 1983.

---

* Defendants Robert Kerry and Paul Douglas were dismissed by the Court on May 12, 1983   (Filing 6).

Charles H. Helein, Brent N. Rushforth, Dow, Lohnes & Albertson, Washington, D.C. and Donn E. Davis, Lincoln, Neb., for plaintiffs.

John Boehm, Asst. Atty. Gen., State of Nebraska, Lincoln, Neb., for defendants.

RICHARD E. ROBINSON, Senior District Judge.

THIS MATTER is before the Court on the application of the plaintiffs for a preliminary injunction. The plaintiffs seek to enjoin the enforcement of a cease and desist order, issued by the Nebraska Public Service Commission (hereinafter "NPSC" or "Commission") on April 19, 1983, directing plaintiff Commline Omaha, Inc. ("Commline") to refrain from offering communications services in the State of Nebraska until it applies for, and is granted, a certificate of public convenience and necessity. On May 13, 1983, the parties filed a Stipulation (Filing 7), wherein the defendants agreed not to press the enforcement of the cease and desist order until this Court has ruled on the instant motion. The parties reaffirmed this stipulation at the conclusion of a hearing held by this Court on May 24, 1983. At the hearing, the plaintiffs presented testimony and offered several exhibits in support of their application; the defendants too offered certain exhibits, including the entire record of the proceedings before the NPSC. For the reasons hereafter explained, the Court, having thoroughly reviewed and considered the arguments of counsel, as well as all exhibits, transcripts and other submitted materials, has decided to resolve this matter as follows:

(1) The Court shall abstain from at this time deciding the constitutional questions posed by the plaintiffs, and shall instead retain the case on its docket, but direct the plaintiffs—specifically, Commline—to petition the NPSC for a certificate of public convenience and necessity.

(2) In the state proceedings, the plaintiffs shall be allowed to declare, on the record, their intention to reserve for this Court a later decision of their federal constitutional questions.

(3) The Court will grant the plaintiffs application for a preliminary injunction, having determined that the plaintiffs are entitled to such interim relief during the pendency of the state proceedings. This Memorandum Opinion constitutes the Court's findings of facts and conclusions of law pursuant to Rule 65, F.R.Civ.P.

I.

STATEMENT OF THE CASE

Atlanta-based Cox Cable Communications, Inc. ("CCCI") is one of the nation's largest cable television operators. It is also the parent company of plaintiffs Commline, Inc., Cox DTS, Inc. and Commline (of Omaha) itself. Each of the above-named companies is wholly-owned by CCCI, and although all three have offices in Omaha, only Commline does business principally in the State of Nebraska. Plaintiff Cox Cable of Omaha, Inc., an eighty percent owned subsidiary of CCCI, provides cable television service to residents of Omaha and Douglas County, Nebraska under the terms of a non-exclusive fifteen year franchise agreement with the City of Omaha, and a similar permit from Douglas County. The individually named defendants are all members of the NPSC.

Under the Omaha franchise, Cox Cable of Omaha provides traditional CATV service, but will eventually offer a two-way transactional service to residential customers. This service will be carried by the "residential" cable plant, sometimes referred to as "Cable A". Commline, as an agent of its sister company, Cox Cable of Omaha, provides service to the business, educational and institutional community over an entirely separate cable, alternatively referred to as the "institutional cable", or "Cable B." It is Commline's activity that is principally at issue in this action.

Commline offers primarily high-speed digital data transmission over a "broadband", or high-capacity, coaxial cable system. Specifically, Commline's system allows its customers to utilize two-way data transmission services at speeds as high as or higher than 1.544 megabits per second (mbps), that is 1,544,000 "electronic pulses" per second; the system can also provide video tele-conferencing, "electronic mail" capability and high-speed fascimile transmission. Commline is not, however, capable of universal,

switched service (i.e. instantaneous access throughout a communications system). Rather, Commline employs "dedicated", or prearranged, communications pathways from point-to-point or point-to-multipoint within the system. Thus, the Commline plant can carry signals only between those locations which have been established, and to which cable "drop lines" have been constructed prior to the institution of service. Although the system does not possess inherent voice capability, a customer may nevertheless obtain this service by simply purchasing the proper equipment. Commline itself does not stock such equipment.

Commline ultimately plans to develop an extensive interstate network. Thus, Commline will interconnect with or serve as the termination point for interstate, long-distance satellite and earth-based microwave carriers such as MCI Communications Corp., Southern Pacific Communications Co. and Satellite Business Systems. At the time of the hearing, Commline had nine customers. One of these customers is MCI, which apparently uses the Commline cable plant to terminate its interstate signals. An important aspect of Commline's business projections concerns its ability to link-up with the newly-created "digital termination service" ("DTS"), a DTS system, as the Court understands it, is basically a microwave system licensed by the Federal Communications Commission ("F.C.C.") to provide digital data transmission, primarily for business and institutional users. To implement its plans, CCCI has caused Cox DTS to be incorporated, and Cox DTS has in turn applied to the F.C.C. for a license allowing it to serve the Omaha/Council Bluffs, Iowa metropolitan area. Commline intends to lease circuits from Cox DTS in order to expand its service offerings for Omaha customers. Tymnet, Inc., another DTS operator, is already licensed to do business in the Omaha area.

In December, 1981, Commline officials made an informational presentation to the NPSC concerning the proposed Commline operation. Commline actually opened for business in June, 1982. In November, 1982, Northwestern Bell Telephone Company requested, in a letter to defendant Harold D. Simpson, that the NPSC commence an investigation of Commline. The letter alleged that Commline was "operating in the state as an unregulated common carrier." *See* plaintiffs' Exhibit 1. On February 14, 25 and March 7, 1983 the NPSC held public hearings in this matter. At the hearings, the plaintiffs offered the testimony of CCCI and Commline officials and introduced other evidence in support of their position that the NPSC has no jurisdiction over the activities of Commline. One witness testified on behalf of Northwestern Bell.

On April 19, 1983, the Commission issued its order finding, *inter alia*, that Commline is a common carrier "furnishing communications services for hire in Nebraska intrastate commerce." *In re Nebraska Public Service Commission Investigation into Proposed Operations of Cox Cable, CCCI and Commline,* Opinion and Findings at 2, ¶ 5 (April 19, 1983) ("NPSC Order"). On April 25, the plaintiffs commenced this action, seeking declaratory and injunctive relief. The plaintiffs challenge the NPSC's assertion of jurisdiction on grounds that it constitutes a "taking" of private property in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution; that the NPSC order and proposed regulation of Commline impermissibly burden interstate commerce in violation of the Commerce Clause, Art. I, Section 8, Clause 3 of the Constitution; and that the order conflicts with plaintiffs' rights under the Communications Act of 1934, 47 U.S.C. §§ 151 *et seq.* (1978), and the established policies of the F.C.C., and thus runs afoul of the Supremacy Clause, Art. VI, Clause 2 of the Constitution, and the principles of federal preemption.

## II.

### ABSTENTION

■ The modern day abstention doctrine derives from Mr. Justice Frankfurter's decision for a unanimous Court in *Railroad Commission of Texas v. Pullman Co.,* 312

U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).[1] In *Pullman,* the Court held that the district court should not have decided the case on its merits, but, rather, should have retained the case on its docket without taking any action until a state court decided whether the defendant Railroad Commission had authority to issue the order that had been challenged in the federal court action. Justice Frankfurter cogently stated the guiding principle: "The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication." 312 U.S. at 500, 61 S.Ct. at 645. Thus, the *Pullman* abstention doctrine is invoked in cases presenting unsettled questions of state law that may be resolved in a state proceeding, so as to render unnecessary the decision of a federal constitutional question. *Coley v. Clinton,* 635 F.2d 1364, 1373 (8th Cir.1980); *see also Monahan v. State of Nebraska,* 491 F.Supp. 1074, 1087 (D.Neb.1980), *aff'd in part, vacated in part on other grounds,* 645 F.2d 592 (8th Cir. 1981). Abstention is appropriate only in exceptional instances where resort to state proceedings "would clearly serve an important countervailing interest." *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959).[2] In this circuit, the court of appeals has identified several factors that the district court should review in deciding whether to abstain. These factors are:

[1] at least two other distinct types of abstention have evolved from Supreme Court decisions. *See Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); see generally 17 Wright, C., Miller, A. and Cooper, E. Fed. Practice & Proc. §§ 4241–4255 (1978). Neither doctrine is applicable in the circumstances of the instant case.

[2] Over the years, the Supreme Court has expressed differing views of when abstention is required. Generally, the Court has maintained that abstention is appropriate when a state statute or procedure is reasonably susceptible to an interpretation that will "avoid or modify the necessity of reaching a federal constitutional decision." *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 306, 99 S.Ct.

[1] what effect will abstention have on the rights to be protected ... [2] whether there are available state remedies ... [3] whether the challenged state law is unclear ... [4] whether the state law is fairly susceptible of an interpretation that would avoid any federal constitutional question ... [and 5] whether abstention will avoid unnecessary federal interference in state operations.

*George v. Parratt,* 602 F.2d 818, 820–22 (8th Cir.1979) (footnotes omitted). For reasons more fully articulated below, the Court believes that this is an appropriate case for abstention, and has decided to retain the case on its docket and to direct the plaintiffs to petition the NPSC for a certificate of public convenience and necessity. The Court is aware that neither side has requested abstention. It is, however, well-settled that a court may raise the issue on its own motion. *See Bellotti v. Baird,* 428 U.S. 132, 143 n. 10, 96 S.Ct. 2857, 2864 n. 10, 49 L.Ed.2d 844 (1976).

The plaintiffs urge this Court to enjoin the NPSC Order on the basis of Fourteenth Amendment due process, the Commerce Clause, the Supremacy Clause and the federal preemption doctrine. Although no state statute is directly challenged, the plaintiffs nevertheless urge this Court to reject the position adopted by the NPSC on certain state law issues. If the Court should agree with the plaintiffs, then the Commission would be stripped of the crit-

2301, 2313, 60 L.Ed.2d 895 (1979) (*quoting Kusper v. Pontikes,* 414 U.S. 51, 54, 94 S.Ct. 303, 306, 38 L.Ed.2d 260 (1973)); *Bellotti v. Baird,* 428 U.S. 132, 147–48, 96 S.Ct. 2857, 2866–67, 49 L.Ed.2d 844 (1976). However, different standards emerge from other decisions of the Court. *Compare Harrison v. National Association for the Advancement of Colored People,* 360 U.S. 167, 177, 79 S.Ct. 1025, 1030, 3 L.Ed.2d 1152 (1959) (state court construction "might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem") *with Zwickler v. Koota,* 389 U.S. 241, 251 n. 14, 88 S.Ct. 391, 397 n. 14, 19 L.Ed.2d 444 (1967) (abstention should be ordered only if the state statute "is of an uncertain nature, and is obviously susceptible of a limiting construction").

ical legal foundation upon which it assumed jurisdiction over Commline.

The Nebraska Constitution, Art. IV, section 20, provides for the establishment of a public service commission and states:

> The powers and duties of such commission shall include the regulation of rates, service and general control of common carriers as the Legislature may provide by law.

The Commission's statutory jurisdictional grant is contained in Neb.Rev.Stat. § 75–109 (Reissue 1981), which states that:

> The commission shall have the power to regulate the rates and services of, and to exercise a general control over, all common carriers, which term is hereby defined as all carriers, including contract carriers, engaged in the transportation of freight or passengers for hire, or furnishing communication services for hire in Nebraska intrastate commerce.

In their briefs to this Court, the parties devote extensive discussion to the question whether Commline is a "common carrier" under Section 75–109. The plaintiffs' witnesses, primarily Mr. Patrick and Mr. Waring, have testified that Commline conducts its business through individualized meetings with prospective customers, that Commline offers a "high-order" communications system that appeals to a limited clientele, and that, in each instance, customers contract for Commline service after detailed, one-on-one negotiations. The defendants, on the other hand, maintain that Commline has always held itself out as available to do business with any customer desiring its services, that Commline is able to lay its cable through the public streets and ways of the City of Omaha by virtue of the franchise agreement between the City and Cox Cable of Omaha and, finally, that Commline, as the acknowledged agent of Cox Cable of Omaha [3], has implicitly undertaken to provide access to its services on a nondiscriminatory basis.

At the hearing on this matter, the defendants urged this Court to find that if Commline is not a common carrier, it is at least a "contract carrier" under Section 75–109. The plaintiffs protest this unsupported allegation on grounds that the NPSC did not consider Commline's status as a "contract carrier", and that, therefore, there was no opportunity to respond to this alleged jurisdictional basis. The plaintiffs further contend that the reference in Section 75–109 to "contract carriers" is ambiguous and, according to their interpretation of the statute, applies only to the transportation industry. The Court's research indicates that the Nebraska Supreme Court has not specifically defined or construed the phrase "contract carrier". That court has, however, outlined the distinctions between "private carriers" and "common carriers." In *City of Bayard v. North Central Gas Co.,* 164 Neb. 819, 83 N.W.2d 861 (1957), the court followed a definition of "common carrier" that had been given in an earlier decision: "[A]ny·person, corporation or association holding itself out to the public as offering its services to all persons similarly situated and performing as its public vocation the services of transporting passengers, freight, messages, or commodities for a consideration or hire, is a common carrier in the particular spheres of such employment." 164 Neb. at 830, 83 N.W.2d at 867 (*citing State ex rel. Winnett v. Union Stock Yards Co.,* 81 Neb. 67, 115 N.W. 627 (1908)). The court contrasted this definition with that applicable to a "private carrier":

> ... [A] private carrier is one who, without making it a vocation, or holding himself out to the public as ready to act for all who desire his services, undertakes, by special agreement in a particular instance only, to transport property from one place or another either gratuitously or for hire.

164 Neb. at 827, 83 N.W.2d at 866 (*quoting* 13 C.J.S., Carriers § 4, p. 31).

---

**3.** In their Supplemental Memorandum to this Court, the plaintiffs explain that the Omaha franchise agreement obligates Cox Cable of Omaha to provide the institutional cable network, but that Commline will construct, implement and operate the system as an agent of Cox Cable of Omaha.

The issue is sharply drawn in the present case: the defendants maintain that Commline fits within the former definition on the basis of the record evidence, while the plaintiffs argue that Commline's activities clearly fall within the latter definition. No judicial decision has addressed the question whether locally-franchised cable operators—either those which offer two-way communications services, as in the present case, or those which provide conventional television transmission—are common carriers, contract carriers or private carriers under the Nebraska statutory scheme.[4] A definitive resolution of this troubling question by the Nebraska Supreme Court would, of course, be binding on this Court and, more importantly, could modify or perhaps avoid altogether the ultimate adjudication of the plaintiffs' constitutional challenges. For this reason alone, the Court believes that abstention is appropriate. But there is an additional, perhaps more compelling, reason for this Court's decision to direct the plaintiffs to return to the NPSC for further proceedings, rather than allowing them to take the usual step of bringing a declaratory judgment action in state court.

The plaintiffs maintain that the assertion of regulatory jurisdiction by the NPSC imposes an unconstitutional burden on interstate commerce. They argue, in essence, that the cease and desist order, and any type of state regulatory scheme, will force Commline to drastically curtail—or shut down entirely—its fledgling operations, thereby depriving potential *interstate* customers of an efficient, reliable, cost-effective communications system. The plaintiffs further contend that the NPSC cannot regulate Commline's activities without running afoul of the Supremacy Clause and principles of federal preemption. In regard to the latter issue, it is well-established that the F.C.C. may preempt state regulation that interferes with interstate communica-

tions. *See, e.g., North Carolina Utilities Commission v. F.C.C.,* 537 F.2d 787 (4th Cir.) *cert. denied,* 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976) (upholding F.C.C. preemption over the interconnection of terminal equipment with the national telephone network). Indeed, the Nebraska Supreme Court has recognized, in a case involving telecommunications, "that the power to regulate interstate commerce is plenary in nature and embraces matters which are intrastate in nature but which affect interstate commerce." *Sherdon v. Dann,* 193 Neb. 768, 776, 229 N.W.2d 531, 536 (1975). Absent explicit statutory language, a pervasive scheme of federal regulation, or a clearly dominant federal interest,[5] state regulation must yield only to the extent that it is inconsistent, or "actually conflicts," with a federal statute. *See Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 158, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978).

In the present case, the NPSC has ordered Commline to apply for a certificate of public convenience and necessity. Yet, assuming that a certificate is granted, it is unclear at this time whether the NPSC will impose an all-encompassing type of regulation, such as that applied to Northwestern Bell, or whether it merely intends to exercise a passive supervisory control over Commline's intrastate activities. The Commission has the power to regulate the rates and services of and to exercise a general control over, all *telephone companies. In re Application No. 30466,* 194 Neb. 55, 58, 230 N.W.2d 190, 194 (1975). (*emphasis added*). In accordance with this broad regulatory purview, Neb.Rev.Stat. § 75–609 (Cum. Supp.1982), provides that the NPSC shall prescribe rates for "local telephone service," and § 75–609.01 (Cum.Supp.1982), exempts telephone companies from rate regulation in certain circumstances. In its order, the NPSC observed that Neb.Rev.Stat. § 75–604 (Reissue 1981)[6] "requires the issuance

---

**4.** The common carrier question is discussed further in section III of this opinion.

**5.** *See Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development*

*Commission,* —— U.S. ——, ——, 103 S.Ct. 1713, 1720, 1721, 75 L.Ed.2d 752 (1983).

**6.** Section 75–604 provides, in part:
No person, firm, partnership, corporation, cooperative, or association shall offer telephone

of a certificate of public convenience and necessity before offering *telephone service* in the territory of another telephone company." NPSC Order at 3 ¶ 9 (emphasis added). The Commission concluded that because Commline services "are offered or may be offered in Omaha by Northwestern Bell Telephone Co., a certificate of public convenience and necessity should be required." *Id.* It is apparent, then, that the NPSC regards Commline's system as a "telephone service," thus broadly interpreting the operative regulatory statutes. *See Application of Radio-Fone, Inc.,* 187 Neb. 637, 644–45, 193 N.W.2d 442, 447–48 (1972) ("telephony" defined, from 1954 Encyclopedia Britanica, as "the entire art of speech transmission with the many accessories and operating methods which research, development and invention have supplied to facilitate and extend conversation at a distance by electrical means").

The Court questions the Commission's literal comparison between Commline and Northwestern Bell. In sharp contrast to Northwestern Bell, Commline neither possesses nor intends to offer universal, switched services. Moreover, Commline mainly provides a "digital data bit stream". *See* plaintiffs' Exhibit 1 (affidavit of G. Robert Patrick). Voice capacity, although possible, can be added only if the customer obtains the proper equipment. Even then, the plaintiffs explain that voice traffic can travel only through dedicated, prearranged channels. Furthermore, certain testimony before the NPSC reveals that Northwestern Bell may itself offer some services through an individualized, purely contractual arrangement with its customers. *See* NPSC Tr. (Testimony of James A. Forchtner, March 7, 1983, at 131–133); NPSC Tr. (Dep-

osition of Gerald A. Christianson, March 15, 1983, at 162–164). There is, finally, a troubling element of selectivity in the Commission's decision to investigate Commline, despite evidence that other Bell competitors presently offer unregulated communications services in the City of Omaha. *See* NPSC Tr. (testimony of James A. Forchtner, March 7, 1983, at pp. 138–141, 154–55, 158–60). In this regard, it is instructive to note the admonition of the Nebraska Supreme Court that the regulatory mission of the NPSC is to serve the public interest, not to establish a monopoly for public utilities. *In re Application No. 30466,* 194 Neb. 55, 62, 230 N.W.2d 190, 195 (1975).

■ The foregoing discussion highlights the primary reasons for the Court's decision to temporarily stay its hand in favor of further proceedings before the NPSC. As noted above, it is impossible to know either whether the NPSC will grant Commline's application for a certificate of public convenience and necessity, or, if it does, what type of regulation will be imposed. In recent years, the F.C.C. has favored regulation by "marketplace forces" over more onerous forms of supervision. This "deregulation"—especially when applied to emerging communications technology—has won approval from the courts. *See Computer and Communications Industry Association v. F.C.C.,* 693 F.2d 198, 217 (D.C.Cir.1982) (upholding "marketplace" regulation of enhanced computer services over objection that the F.C.C. had created a "vacuum of deregulation"); *cf. New York State Commission on Cable Television v. F.C.C.,* 669 F.2d 58, 66 (2d Cir.1982) ("Federal regulation need not be heavy handed in order to preempt state regulation"). Thus, the Court believes that it will be in a better,

---

service . . . in the territory of another telephone company without first making an application for and receiving from the commission a certificate of convenience and necessity, . . . Before granting a certificate of convenience and necessity, the commission must find that (1) the territory in which the applicant proposes to offer telephone service is not receiving reasonably adequate telephone service, (2) that the portion of the territory of another telephone company in which or into which the applicant

proposes to construct new lines or extend its existing lines is not and will not within a reasonable time receive reasonably adequate telephone service from the telephone company already serving the territory, or (3) the application is agreeable to the subscriber or subscribers and to both telephone companies involved in the matter, will not create a duplication of facilities, and is in the interest of the public and the party or parties requiring telephone service. .

more informed position to fashion appropriate relief once the Commission has made its decision concerning the certificate and, if it is granted, the subsequent regulation of Commline.

Although not the usual course under the *Pullman* doctrine, other courts have sanctioned initial resort to state administrative agencies. In *Deck House, Inc. v. New Jersey State Board of Architects*, 531 F.Supp. 633 (D.N.J.1982), the plaintiffs sought declaratory injunctive relief from an order of the Board of Architects that required them to refrain from doing business in New Jersey because the Board had concluded that they were practicing architecture without a license. The plaintiffs attacked the Board's decision on statutory and constitutional grounds, alleging in particular that the Board's interpretation and application of the state architectural licensure statute placed an unconstitutional burden on interstate commerce. The court invoked the *Pullman* abstention doctrine, concluding that:

> The Pullman doctrine requires that the state courts be given an opportunity to decide the state law questions before the federal court addresses the federal questions and in the process adopts a possibly erroneous interpretation of the state statutes. To accomplish this end, I will stay proceedings in this case to give the parties an opportunity to complete the proceeding before the Board of Architects and, if any party elects to do so, to pursue appropriate appeals in the state courts.

*Deck House, Inc., supra*, 531 F.Supp. at 645; *cf. Williams v. Red Bank Board of Education*, 662 F.2d 1008, 1023 (3d Cir.1981) (remanding to district court to allow parties to proceed before administrative agency while the court retained jurisdiction under the *Younger* abstention doctrine). Similarly, one court has said that where "resolution of the ambiguity in state law requires construction of state administrative as well as legislative policy, we think the proper course is for the federal court to abstain, while retaining jurisdiction." *Catrone v. Massachusetts State Racing Comm'n*, 535 F.2d 669, 671 (1st Cir.1976).

This Court is convinced that it is likewise appropriate to stay further proceedings in this case while the parties return to the NPSC and, if they later desire, the Nebraska Supreme Court. Of course, depending on the Commission's decision, the plaintiffs may wish to return to this Court to seek additional relief. This they may do by reserving their right to litigate the constitutional questions now before this Court. *See England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). In *England,* the Court expressed "fundamental objections to any conclusion that a litigant who has properly invoked the jurisdiction of a Federal District Court to consider federal constitutional claims can be compelled, without his consent and through no fault of his own, to accept instead a state court's determination of those claims." 375 U.S. at 415, 84 S.Ct. at 464. Thus, a party is not required to litigate his federal claims in the state proceedings, but instead must "inform those courts what his federal claims are, so that the state statute may be construed 'in light of' those claims." *England, supra,* 375 U.S. at 420, 84 S.Ct. at 467. Accordingly, the plaintiff must make an on-the-record "reservation to the disposition of the entire case by the State courts ..." *Id.* at 421, 84 S.Ct. at 468. In any event, a party cannot be denied the right to return to district court, "unless it clearly appears that he voluntarily ... litigated his federal claims in state courts." *Id.* at 421–22, 84 S.Ct. at 467–68.

### III.

### THE PRELIMINARY INJUNCTION

Having concluded that the plaintiffs may proceed before the NPSC, and perhaps on to the Nebraska Supreme Court, while reserving their right to later return to this Court for litigation of their federal constitutional claims, it now becomes necessary to determine whether interim relief—in the form of a preliminary injunction—is appropriate. In *New Jersey Presbytery of the Bible Presbyterian Church v. New Jersey State Board of Higher Education*, 654 F.2d

868 (3d Cir.1981), the court held that injunctive relief was appropriate in a *Pullman* abstention case, and declared that:

> ... [A] motion for preliminary injunctive relief ... ought, we think, to be considered without regard to the separate question whether a *Pullman* stay of final hearing is appropriate. Assuming the case is not to be dismissed outright, the district court should be guided by the classic requirements for a preliminary injunction.

654 F.2d at 887. Other courts have reached similar conclusions. *See, e.g., Deck House, Inc., supra; Cetrone v. Massachusetts State Racing Commission, supra.*

■■■ It is established beyond peradventure that the principal function of a preliminary injunction is to preserve the status quo pending adjudication of the case on its merits. Furthermore, because an injunction is an extraordinary remedy, it should be granted sparingly and in a manner that accords the maximum possible protection to those affected by its issuance. *See Greater-Iowa Corp. v. McLendon,* 378 F.2d 783, 799 (8th Cir.1967). A federal court, moreover, must therefore enjoin the actions of state officials only under circumstances that evince a compelling need for equitable relief. *Vorbeck v. McNeal,* 407 F.Supp. 733 (E.D.Mo.), *aff'd without opinion,* 426 U.S. 943, 96 S.Ct. 3160, 49 L.Ed.2d 1180 (1976).

In *Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109 (8th Cir.1981) (en banc), the court of appeals established a bright-line test for the issuance of preliminary injunctions. Reviewing its earlier decisions on the subject, the court reiterated the appropriate standards:

> Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Dataphase, supra,* at 113, 114. The court refused, however, to apply a mathematical formula to the "probability of success" element. The court emphasized that "[a]t base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* Under the *Dataphase* test, "no single factor is determinative;" therefore, "where the movant has raised a *substantial question* and the equities are otherwise strongly in his favor, the showing of success on the merits can be less." *Id.* (emphasis added); *see also Medtronic, Inc. v. Gibbons,* 527 F.Supp. 1085, 1092 (D.Minn.1981), *aff'd,* 684 F.2d 565 (8th Cir.1982) (movant not required to show fifty percent or greater chance of success on the merits). The Court, having carefully considered the briefs, affidavits, exhibits, transcripts and live testimony offered by both sides, concludes that the plaintiffs have met their burden under the *Dataphase* test and are thus entitled to preliminary injunctive relief.

### A.  *Threat of Irreparable Harm.*

At the hearing on this matter, Mr. Paul Waring, senior vice president of CCCI, testified that the parent company has decided to permanently shut down Commline's operations if the NPSC Order is not enjoined. *See* Tr. at 52. The defendants, on the other hand, point out that the NPSC order merely requires Commline to cease operations while it applies for a certificate of public convenience and necessity and that, furthermore, the order does not in any way interfere with Commline's *interstate* activities. But these arguments ignore the critical question whether the NPSC can regulate Commline at all or, stated differently, whether state regulation has been preempted by the F.C.C.

The Court specifically finds the following facts established for purposes of the pending application:

1.  Commline's parent, CCCI of Atlanta, has spent three years and $14.5 million to develop Commline's two-way capability, and has invested $2.3 million to construct the

yet uncompleted Commline cable network for Omaha.

2. Commline is a fledgling commercial enterprise: at the time of the hearing it had only nine customers in Omaha, including long-distance carrier MCI.

3. The uncertainty engendered by the NPSC investigation and order has deterred at least some potential customers from accepting Commline services.

4. On May 11, 1983, the F.C.C. granted a license to Tymnet, Inc. for the construction and operation of Omaha's first DTS facility. *See* F.C.C. file No. 9751–CDM–P–81, Call Sign WHB971. This facility will compete directly with Commline.

The Court is somewhat puzzled by the finality of CCCI's decision to discontinue Commline's Omaha operation absent judicial intervention. Yet, the Court agrees that Commline will be placed at a severe financial and competitive disadvantage if it is forced to suspend operations pending the outcome of further proceedings either before this Court or before the NPSC. *See Newport Tire & Rubber Co. v. Tire and Battery Corp.,* 504 F.Supp. 143 (E.D.N.Y. 1980) (act that threatens an ongoing business with destruction causes that business irreparable injury.) The NPSC Order, moreover, actually presents the plaintiffs with a Hobson's choice: in the absence of injunctive relief, Commline, as agent for Cox Cable of Omaha, must either turn aside, at least temporarily, from its franchise commitment to provide an "institutional" cable communications system for the City of Omaha, or risk prosecution by continuing its operations. The Court concludes, therefore, that the plaintiffs have established a threat of irreparable harm.

B. *The "Balance of Hardships".*

The defendants urge the Court to reject this application for injunctive relief because, they allege, the plaintiffs acted improperly by failing to seek approval from the NPSC in the first instance. This argument, which most closely resembles the equitable defense of "unclean hands," is not well founded. According to the evidence, the plaintiffs made an informational presentation of their proposed services to the NPSC in December, 1981, a full six months before Commline commenced service. The defendants do not contest this assertion, but instead suggest that the presentation was inconsequential because it was informal and off-the-record. The plaintiffs did not attempt to hide Commline's entry into the communications marketplace. On the contrary, in the middle and latter months of 1982, the Omaha World Herald published several articles about Commline's proposed operations. *See* plaintiffs' Exhibit 1. The defendants' assertions in this regard are not supported by the record before this Court.

In passing upon plaintiffs' application, it is appropriate for the Court to consider the absence of substantial harm to other interested parties, and to the public interest. *See Minnesota Bearing Co. v. White Motor Corp.,* 470 F.2d 1323, 1326 (8th Cir.1973). The defendants contend that Northwestern Bell offers service that is competitive to Commline's. The NPSC evidently agreed with this position. *See* NPSC Order, at 3, ¶ 9. It is difficult to fathom how a company with fewer than a dozen customers can pose a significant threat to Northwestern Bell. On the other hand, the defendants persuasively argue that it is unfair for an unregulated company such as Commline to pursue the most lucrative potential accounts, while Northwestern Bell is required to compete for the same customers as a regulated carrier under Nebraska law. The Court finds it unnecessary to decide whether Northwestern Bell and Commline in fact offer substantially similar service. The Court does find, however, that any disadvantage that might befall Northwestern Bell as a result of Commline's continued operations is outweighed by the threat of irreparable harm to the plaintiffs if Commline is forced to cease operations.

The defendants also maintain that permitting Commline to continue doing business as an unregulated entity "frustrates the purpose of the Nebraska laws regarding regulation of communications carriers." Defendants' Reply Memorandum, at 4.

This assertion, however, begs the question whether the NPSC properly assumed jurisdiction over Commline in the first place. Furthermore, the Court believes that, by directing the plaintiffs to return to the NPSC to seek a certificate of public convenience and necessity, it has sufficiently accommodated the state's interest in the enforcement of its regulatory laws and policies.

Finally, it is Commline alone which runs the risk of continuing its operations in the current regulatory limbo. It is Commline alone which risks financial jeopardy by investing further in plant and equipment while these crucial issues await final resolution. In accordance with the foregoing discussion, the Court finds that the balance of hardships tips decidedly in favor of granting the plaintiffs' application for a preliminary injunction.

## C. *Probability of Success on the Merits.*

As a threshold matter, it is appropriate to examine the defendants' assertion that Commline is a common carrier subject to regulation by the NPSC pursuant to Neb.Rev.Stat. 75–109.[7] Because of the Court's decision to abstain, a final ruling on this crucial issue must await another day. Nevertheless, it is instructive to briefly review the pertinent decisions on this hotly contested question.

It is a violation of Fourteenth Amendment due process for a state to force an otherwise private carrier to become a common carrier in order to do business in that state. *Frost v. Railroad Commission of*

*California,* 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101 (1926). In *Frost,* the Court recognized that the challenged act was designed "to protect the business of those who are common carriers in fact by controlling competitive conditions." *Id.* at 591, 46 S.Ct. at 606. The plaintiffs complain that the NPSC's investigation and subsequent order accomplishes the same unconstitutional result, namely, controlling competitive conditions by forcing a private carrier either to do business as a regulated common carrier, or not at all. It must be noted that the *Frost* Court expressly limited its holding, explaining that the decision was "not to be understood as challenging the power of the state, . . . whenever it shall appear that a carrier, posing as a private carrier, is in substance and reality a common carrier, to so declare and regulate his or its operations accordingly." *Frost, supra,* at 600, 46 S.Ct. at 609.[8]

The dearth of statutory definition, *see, e.g.,* 47 U.S.C. § 153(h), has prompted the courts to turn to the common law in determining the nature and scope of common carrier status in the communications field. In *National Association of Regulatory Utility Commissioners v. F.C.C.,* 525 F.2d 630 (D.C.Cir.1976) ("NARUC I"), the court examined at length the history and purpose of the concept. The court explained that, regardless of which traditional policy reason was invoked, the existence of common carrier status turns on the "quasi-public" character of the activity at issue. Significantly, the court also declared that "it is not enough that a carrier offer his services for a profit, since this would bring within the

---

**7.** At the hearing, as noted in section II, the defendants argued that Commline's activities also fit within the meaning of the term "contract carrier" in section 75–109. The Court is troubled by the defendants' failure to press this interpretation earlier and, moreover, observes that the Commission does not appear to have considered the issue in the first instance. Nevertheless, the Court's decision to abstain allows it to reserve ruling on this question pending the outcome of the state proceedings.

**8.** The *Frost* decision has been applied in the area of cable *television* regulation. *See Midwest Video Corp. v. F.C.C.,* 571 F.2d 1025, 1051

(8th Cir.1978), aff'd, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979) (Court found it "an unwarranted intrusion into the conduct of a cable enterprise for the Commission to mandate that cable companies offer services as common carriers or not at all . . .") Interestingly, the court declared that "[n]either the basic rationale for regulation of common carriers (to insure fair and equal access to the carrier's service) nor that for regulation of broadcast transmissions (to preclude bedlam on broadcast frequencies), is applicable to cable systems *per se.*" 571 F.2d at 1036.

definition private contract carriers which the courts have emphatically excluded from it." *Id.* at 641. Thus, the court held that although an entity that renders service to only a segment of the population may nevertheless be a common carrier, it is essential that the "carrier" hold itself out to do business on an indiscriminate basis. *Id.* In contrast, "a carrier will not be a common carrier where its practice is to make individualized decisions, in particular cases, whether and on what terms to deal." *Id.* In the communications field, the courts and the F.C.C. have fashioned an additional element: whether the customers may "transmit intelligence of their own design and choosing." *Computer and Communications Industry Ass'n. v. F.C.C.,* 693 F.2d 198 (D.C. Cir.1982) (*quoting Industrial Radiolocation Service,* 5 F.C.C.2d 197, 202 (1966)); *National Association of Regulatory Utility Commissioners v. F.C.C.* 533 F.2d 601, 609 (D.C. Cir.1976) ("NARUC II").

In *NARUC II, supra,* a panel of the same court reiterated the standards discussed in *NARUC I.* The defendants quote extensively from Judge Wilkey's opinion for the court; however, the actual holding of the 2–1 majority rests on much narrower grounds than those advanced by Judge Wilkey. Thus, the court ruled that the F.C.C.'s decision to preempt state and local regulation over the use of cable system leased access channels for two-way, point-to-point, non-video communications exceeded its jurisdiction under the "ancillary to broadcasting" standard first recognized in *United States v. Southwestern Cable Co.,* 392 U.S. 157, 88 S.Ct. 1944, 20 L.Ed.2d 1001 (1968). Hence, Judge Wilkey's conclusion that the cable operators at issue were intrastate common carriers is of no particular moment, since it simply does not represent the holding of the court. *See NARUC II, supra,* 553 F.2d at 621, 634. (". . . I think it is unnecessary to reach the question of whether the F.C.C. is deprived of jurisdiction under 47 U.S.C. § 152(b)" . . .) (Lumbard, Jr., concurring); (Since I too reject the conclusion that Section 152(b) bars the Commission's assertion of jurisdiction, Judge Wilkey's views on this issue do not constitute the holding of this court.") (Wright, J., dissenting).

The defendants maintain that the franchise agreement between the City of Omaha and Cox Cable imposes a duty on Cox, through its agent, Commline, to offer the institutional cable services as a common carrier. However, the court's review of the relevant franchise documents compels no such conclusion. For example, NPSC Exhibit II (2/25/83), the Cox Cable proposals, indicates that the institutional cable "will interconnect all governmental, educational, medical, judicial and commercial users with 150 miles of system," and identifies a large number of such potential users. But the proposals also mention that Cox plans to undertake individual negotiations with its institutional customers. On the other hand, Commline's cable plant is physically located, at least in part, in the public domain. In addition, certain promotional materials indicate that Commline has advertised its services as a feasible alternative for a broad segment of the Omaha market. *See, e.g.* NPSC Exhibit 21 (3/7/83). Yet, it is apparent that Commline intends to operate its business much like any other private concern. Hence, Commline offers its services to the population at-large, hoping to attract as many customers as possible, but understanding that its "product" is not for everyone. Because of its decision to abstain, the Court makes no explicit finding on the common carrier issue. The "probability of success" element of the *Dataphase* test does not require the moving party "to prove a fifty percent or greater chance of success . . ." *Medtronic, Inc. v. Gibbons,* 527 F.Supp. 1085, 1092 (D.Minn.1981), *aff'd,* 684 F.2d 565 (8th Cir.1982). Rather, each case should be evaluated "in light of the equities." *Id.* Accordingly, the Court finds that the plaintiffs have raised a serious question of fact and law that should be fully litigated, if necessary, at the conclusion of the state proceedings mandated by the Court's decision to abstain.

(i) *The Supremacy Clause and Preemption.*

In Part II of this Memorandum Opinion, the Court reviewed some of the

governing legal principles used by the courts to analyze federal-state legislative and regulatory conflicts. To summarize, a state statute is void under the supremacy clause if congressional enactments have either explicitly or implicitly precluded all state legislation in the same field. *Jones v. Rath Packing Co.,* 430 U.S. 519, 525–26, 97 S.Ct. 1305, 1309–10, 51 L.Ed.2d 604 (1977). Alternatively, a state statute will fall if it is so inconsistent with federal law that it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

The plaintiffs do not contend that Congress has expressly preempted state regulation over two-way cable communications systems.[9] Rather, the plaintiffs argue that Commline is subject to the exclusive regulatory jurisdiction of the F.C.C. because its cable plant is an "integral link" in the origination, distribution and termination of interstate communications. In Part II of this opinion, the Court noted that the F.C.C. may preempt state regulation that interferes with interstate communications. *See North Carolina Utilities Commission v. F.C.C.,* 537 F.2d 787 (4th Cir.), *cert. denied,* 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976); *Sherdon v. Dann,* 193 Neb. 768, 229 N.W.2d 531 (1975). Indeed, Commline may be subject to preemptive F.C.C. jurisdiction even though its cable plant is physically located solely within the State of Nebraska. *See, e.g., United States v. Southwestern Cable Co.,* 392 U.S. 157, 168–9, 88 S.Ct. 1994, 2000–2001, 20 L.Ed.2d 1001 (1968); *New York Telephone Co.,* 76 F.C.C.2d 349, 352, *aff'd sub nom. New York Telephone Co. v. F.C.C.,* 631 F.2d 1059 (2d Cir.1980); *Telerent Leasing Corp.,* 45 F.C.C.2d 204, 219 (1974), *aff'd sub nom. North Carolina Utilities Commission v. F.C.C.,* 537 F.2d 787 (4th Cir.), *cert. denied,* 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976). Hence, "[t]he key to jurisdiction is the nature of the communication itself rather than the physical location of the technology." *New York Telephone Co. v. F.C.C., supra,* 631 F.2d at 1066.

The plaintiffs acknowledge that some of Commline's existing and future customers have or will have a need for a "hybrid" combination of local and interstate communications services; indeed, the plaintiffs admit that certain customers will use the system for purely local communications. Yet, they have consistently maintained, in testimony before this Court and before the NPSC, that it is economically and technologically impracticable—although not impossible—to separate intrastate communications from those which are interstate. Thus, they argue that the NPSC is without authority to assert its jurisdiction over any aspect of the Commline network. In *People of the State of California v. F.C.C.,* 567 F.2d 84 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1010, 98 S.Ct. 721, 54 L.Ed.2d 753 (1978) (per curiam), the court affirmed the F.C.C.'s position in a jurisdictional dispute over communications facilities that were used for both inter- and intrastate communications. Even though the facilities were located within single states, the court held that '... the Commission properly recognized that it may regulate facilities used in both inter- and intra-state communications to the extent it proves "technically and practically difficult" to separate the two types of communications.' 567 F.2d at 80 (citations omitted).

During oral argument, the defendants suggested that the varying types of communications could be monitored and segregated because Commline utilizes a dedicated network and must therefore be aware of the type of communications a particular customer will be sending when that customer initially receives service. *See* Hearing Tr. at 107–109. The plaintiffs, on the other hand, maintain that the total mix of communications traffic is subject to constant fluctuation and that inter- and intrastate communications can be effectively segre-

---

**9.** On June 14, 1983, the United States Senate passed Senate Bill 66, a copy of which is in evidence as defendants' Exhibit 2. 98th Cong., 1st Sess., 129 Cong.Rec. 8291–8328 (1903). S. 66 seeks to preempt most state regulation over two-way cable communications systems.

gated only by the construction of separate cable plants. In this regard, the Court finds persuasive the plaintiffs' analogy to the circumstances reviewed in *North Carolina Utilities Commission v. F.C.C.,* 537 F.2d 787 (4th Cir.1976), wherein the court of appeals upheld an F.C.C. declaratory ruling that established authority over the interconnection of customer-provided telephone equipment. The facilities at issue were "used in common and indivisibly for all local and long distance calls." *Id.* at 791 (*quoting* 45 F.C.C.2d 204, 215). The court agreed that the equipment could not feasibly be limited in use to either inter- or intrastate transmissions. *Id.* Declaring that state regulation is permissible only to the extent that it is separable from and does not "substantially affect the conduct or development of interstate communications," the court concluded that the F.C.C.'s jurisdiction was proper under the Communications Act of 1934. *Id.* at 793–94; *cf. Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963) (federal state conflict may arise when "compliance with both federal estate regulations is a physical impossibility.").

The circumstances of the present case vary only slightly from those present in *North Carolina Utilities Commission.* Moreover, plaintiffs position is further enhanced by the recent decision of the F.C.C. preempting state regulation of DTS systems. *First Report and Order,* Gen.Dkt. 79–188, 86 F.C.C.2d 360 (1981); *recon.* 90 F.C.C.2d 319 (1982), *appeal pending sub nom. National Association of Regulatory Commissioners v. F.C.C.,* Case No. 81–1556 and consolidated cases (D.C.Cir.). ("DTS Report"). In the *DTS Report,* the F.C.C. announced its decision to "preempt inconsistent state regulation of technical standards, market entry standards, and rates and tariff regulations of all carriers using DTS facilities." 86 F.C.C.2d at 389–90. The F.C.C. explained that its decision was influenced by the "need for spectrum for the termination of interstate services employing high-speed digital technology," and concluded that "[i]nconsistent state regula-

tion could impede the development and provision of this proposed new and innovative telecommunications service." *Id.* The defendants argue that DTS licensees provide only *interstate* services, whereas Commline, by its own admission, provides both interstate and intrastate services. This contention is incorrect. In its decision, the F.C.C. recognized that some DTS facilities will provide intrastate links. 86 F.C.C.2d at 390. Moreover, DTS and Commline provide similar technological capabilities, as both systems are designed to function primarily as transmission media for high-speed data streams. Although the result is by no means certain, the Court believes that the plaintiffs have demonstrated a strong probability of success on the merits of this issue.

### (ii) *The Commerce Clause.*

The plaintiffs complain that Commline's business, at least a portion of which is interstate in nature, will be severely burdened if it is forced to compete as a state-regulated common carrier. Specifically, the plaintiffs contend that state regulation will increase costs to Commline customers and in particular will impede Commline's plans to interconnect with interstate microwave and DTS carriers. A final resolution of this question depends, first of all, on whether the F.C.C. has preemptive jurisdiction over Commline and, secondly upon the extent of state regulation ultimately imposed by the NPSC. Yet there is authority which suggests that Commline's plan to interconnect with DTS facilities is alone sufficient to give Commline an "interstate character." *See New York State Commission on Cable Television v. F.C.C.,* 669 F.2d 58, 64 (2d Cir.1982) (state regulation of "master antenna" systems effectively reduced number of reception points for interstate carrier and thus imposed impermissible burden on interstate commerce). Furthermore, the Court doubts that the NPSC can legally impose a dual regulatory scheme such as that applied to the Bell system. The F.C.C. has declared that:

There is nothing in the Communications Act or its legislative history which supports the position ... [that] a State may, in effect, determine the terms and conditions upon which ... common plant is to be used for interstate service. It is one thing to exempt intrastate services from Federal jurisdiction. It is quite a different matter to argue that by virtue of this exemption plant used in common for both intrastate and interstate services is beyond Federal jurisdiction ... and can be subjected to a melange of regulations, determined by each of 50 separate jurisdictions ...

*In re Telerent Leasing Corp.,* 45 F.C.C.2d 204, 219–20 (1974), *aff'd sub nom. North Carolina Utilities Commission v. F.C.C.,* 537 F.2d 787 (4th Cir.), *cert. denied,* 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976). Accordingly, the Court finds that the plaintiffs have established a substantial likelihood that the NPSC will impermissibly burden interstate commerce if it mandates a regulatory scheme that significantly impedes Commline's planned interconnection with DTS and other interstate systems.

### D. *The Public Interest.*

In recent years, the communications industry has undergone explosive technological change. During this time, the F.C.C. has consistently encouraged and fostered the development of new, innovative communications services. Indeed, the United States Supreme Court has hailed the "phenomenal" potential of cable systems in this dynamic industry. *See United States v. Midwest Video Corp.,* 406 U.S. 649, 651, 92 S.Ct. 1860, 1862, 32 L.Ed.2d 390 (1972). Commline's service clearly expands the alternatives that are available in the Omaha communications market. But, on the other hand, the NPSC has a legitimate interest in assuring ongoing compliance with its regulatory mission. The Court believes that NPSC policies will not be significantly frustrated if the preliminary injunction is granted; since the activities of Commline will once again come under the scrutiny of the NPSC, it is only fair to maintain the status quo while the Commission considers its next move. In the view of this Court, the public interest militates in favor of granting the injunctive relief sought by the plaintiffs.

### IV.

### CONCLUSION

Although neither side has raised the issue, the Court is thoroughly convinced that abstention under the *Pullman* doctrine is an appropriate decision in this equitable proceeding. In our system, a federal court must always hesitate when asked to wield its power against an organ of state government. The decision to enjoin a state official from the performance of his perceived duties must be a contemplative, rather than hasty, act. By temporarily staying its hand, the Court will accommodate the important countervailing interest of the Public Service Commission in supervising companies which offer communication services in the State of Nebraska. Furthermore, a decision by the NPSC or the Nebraska Supreme Court will almost certainly alter or modify this Court's eventual decision of the weighty constitutional questions posed in this action.

Finally, having scrutinized this matter in light of the four *Dataphase* factors, the Court finds that the plaintiffs are entitled to a preliminary injunction while they apply to the NPSC for a certificate of public convenience and necessity.